Reposting correct version

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

IRVING ALEXANDER RAMIREZ,
Defendant and Appellant.

S155160

Alameda County Superior Court
151080

_____

January 28, 2021

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Liu, Cuéllar, Kruger, Groban and Huffman[*] concurred.

_____

_____

[*]   Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# PEOPLE v. RAMIREZ

## S155160

Opinion of the Court by Cantil-Sakauye, C. J.

A jury convicted defendant Irving Alexander Ramirez of the first degree murder of San Leandro Police Officer Nels Niemi. (Pen. Code §§ 187, subd. (a), 189; all subsequent statutory references are to the Penal Code unless otherwise specified.) The jury also found true the charged firearm enhancements and special circumstance allegations. Specifically, it found true the allegations that (1) defendant murdered Niemi to prevent or avoid a lawful arrest (§ 190.2, subd. (a)(5)), and (2) defendant intentionally killed Niemi, a peace officer engaged in the lawful performance of his duties, and defendant knew, or reasonably should have known, that Niemi was such an officer (§ 190.2, subd. (a)(7)). The jury returned a verdict of death.

The trial court sentenced defendant accordingly. In conjunction with the death judgment, the court ordered defendant to pay a restitution fine of $10,000. (§ 1202.4, subd. (b).) This automatic appeal followed. We affirm the judgment in its entirety.

## I. BACKGROUND

### A. Evidence at the Guilt Phase

Defendant did not contest that he shot and killed Niemi. He did dispute, however, that he committed the killing with the requisite mental state to be guilty of first degree murder. Because of the thrust of defendant's argument, both the

prosecution and defense introduced extensive evidence of defendant's activities preceding, immediately surrounding, and following the murder.

### 1. *Prosecution case*

The prosecution's theory of the crime was that defendant killed Niemi to avoid arrest. To demonstrate that defendant had reason to fear arrest, the prosecution introduced the testimony of Mark Sheldon, a police officer with the City of Pleasanton. Sheldon related that in December 2004 — about seven months before defendant had the fatal interaction with Niemi — Sheldon pulled over defendant's vehicle. Sheldon asked defendant for his identification, much like Niemi did seven months later. Instead of producing his driver's license, defendant gave Sheldon his California identification card. This caused Sheldon to suspect that defendant's license was suspended and defendant was on probation. Sheldon "did a records check," which confirmed that defendant "was on probation with[] . . . a four-way search and seizure," which gave Sheldon the ability "to search [defendant's] person, property, vehicle and the home." Sheldon searched defendant and discovered suspected methamphetamine and cocaine in his front pocket. Sheldon arrested defendant, who subsequently spent 45 days in jail. Relying in part on Sheldon's testimony, the prosecution argued that defendant shot Niemi after Niemi requested his identification because defendant thought "[t]he officer had my ID, he was going to run it. I was subject to search and seizure, I was going to go to jail, so I killed him."

To establish what transpired on the day of the murder, the prosecution introduced testimony of the four individuals who were with defendant when he shot Niemi. Those present at the

crime scene were Vincente Heredia, Frank Gonzales, Miguel Rangel, and Jose Luis Arteaga. Heredia testified that on the day of the murder, he called defendant, requesting to borrow a gun. Defendant dropped off a gun for Heredia at the home of Heredia's mother, which was located on Doolittle Drive in San Leandro. Later that day, Heredia discharged the firearm, but after firing once, the gun jammed. Heredia then called defendant to inform him that the gun had jammed and defendant should pick it up.

After receiving the call from Heredia about the jammed gun, defendant drove to Doolittle Drive. Along the way, he picked up a friend, Arteaga. Arteaga testified that because defendant had been drinking "since earlier that day," his driving was "very erratic." Arteaga asked defendant to pull over so he could drive instead. Defendant complied and gave Arteaga turn-by-turn directions to Heredia's place. According to Arteaga, defendant had multiple firearms in the car, including a shotgun, a "dark color handgun," and a box of ammunition for the shotgun. A subsequent search of defendant's vehicle confirmed Arteaga's report of the shotgun and ammunition.

When defendant and Arteaga arrived at Doolittle Drive, they entered the home with Heredia. Heredia handed the gun to defendant, who "took it apart," "looked at it," and explained why the gun jammed. Defendant then put the gun away on his person. The three men went back outside.

Once outdoors, Heredia, Arteaga, and defendant were joined by Gonzales (Heredia's half brother) and Rangel (Gonzales's cousin). Defendant had brought a bottle of Hennessy cognac with him, and the group drank from the bottle. As the men were standing about, a neighbor called the police

about "a group of [juveniles] loitering and blocking [a] driveway." Officer Niemi was dispatched to the scene. This was the second time that day that Niemi was called to the Doolittle Drive location because of juveniles congregating in the area. Niemi had earlier dispersed a group of individuals without incident. Responding to the second call, Niemi arrived at the scene at 10:57 p.m.

All four individuals with defendant — Heredia, Arteaga, Gonzales, and Rangel — testified regarding the interaction between the group and Niemi when Niemi arrived at Doolittle Drive. After pulling up in his patrol vehicle, Niemi asked the men if they were "the same . . . people he had kicked out of there earlier." Heredia told Niemi they were not. Niemi got out of the car, asked the men if they had been drinking, and requested to see their identification. Niemi collected an identification card (ID) first from Heredia and then from defendant. Defendant took some time to produce his ID, as he was "fumbling around" with his wallet. He eventually handed his ID to Niemi, who turned to Rangel and took his ID. Arteaga testified he thought Niemi was "calling [the identification] in" because he saw the officer reach for the radio located on his left shoulder.

As Niemi was handling the IDs, defendant pulled a handgun and shot the officer in the head. The shooting happened suddenly and unexpectedly.

After defendant shot Niemi, the group scattered. As they ran, the group's members heard more shots fired. Arteaga stated he saw Niemi "on his back, on the ground" with defendant standing over him before hearing additional shots. Through eyewitness and expert testimony, the prosecution showed that

defendant shot Niemi six times in total, emptying the clip in his handgun.

The five men ran to their cars and divided into two separate vehicles. Gonzales and Rangel entered Gonzales's car, while Heredia, Arteaga, and defendant used Heredia's. Although Gonzales and Rangel initially drove away from the crime scene, they quickly returned. Rangel went to where Niemi was lying. He "noticed that there was a bottle of Hennessy" and an ID next to the officer. Rangel picked up both objects, saw that the ID was neither his nor Heredia's, and threw the bottle and ID aside. As it turned out, the ID that Rangel found — later recovered by the police — was defendant's. Officers arrived on the scene thereafter.

The three men in Heredia's car fled the scene. Heredia and Arteaga testified that they were panicked and worried. Both Heredia and Arteaga pressed defendant about why he shot the police officer. According to Heredia, defendant replied, "I was gone. I was gone. I was gonna go." Heredia explained the expression means that "you were going to go to jail or was [sic] going to be gone for a while." Arteaga similarly testified that defendant responded "I was done," which means "I'm gonna get caught."

Defendant asked Heredia to drive over the Dumbarton Bridge. Heredia refused because he wanted to go home. As Heredia was driving on the road that was "the last exit before the bridge," defendant told him to stop. Defendant then got out of the car, walked to the marsh, "threw something" away, and "came back [to] the car" wearing nothing but boxer shorts. Heredia dropped defendant off at defendant's residence. Ashley Ewert, defendant's then-girlfriend, was there waiting for him.

At trial, Ewert testified as follows. Defendant came through the door wearing just his boxers. He started telling Ewert "to get everything out." He then grabbed a bottle of bleach and went into the shower. When he came out of the shower, defendant repeated that Ewert had to help him, "to get everything out," and that they "had to go." Ewert left with defendant in her car. When they were in the car, defendant "started wiping his hands and his arms with alcohol swabs." Ewert asked defendant what was happening, and defendant confessed that he "just shot a cop," "just killed a cop." Defendant directed Ewert to drive to Arteaga's house. Arteaga gave defendant some money. Defendant and Ewert then drove away.

Back in the car, defendant recounted to Ewert more of what happened. Defendant said that he was with Arteaga and Heredia when a policer officer "pulled up and asked for their I.D.s." Defendant gave the officer his identification. "The police officer went to reach for his radio, and [defendant] shot him once in the face, and then four more times." Defendant "rolled over the police officer to try to find his I.D., and he grabbed what he thought was his I.D. . . . and left." Crucially, defendant told Ewert why he shot Niemi, explaining that "he had a search and seizure, and that if the police officer called in his name, he would be arrested, because he had two guns and drugs on him."

Ewert and defendant then went to a Safeway grocery store. There, defendant — who had asthma — stole an inhaler. The theft was captured on video, and the prosecution showed the jury the video.

The pair left Safeway, at which point defendant told Ewert that they had to go back to his residence. Defendant explained that "he needed to get the gun and bullets that were at his

house" because "they were the same bullets that were in the gun that he used to kill the police officer." Ewert drove defendant back to his house. Defendant entered the house and returned with a gun and a bag containing ammunition.

Defendant then told Ewert to drive to the Dumbarton Bridge. As they were crossing the bridge, Ewert — as instructed — "slowed down in the far right lane at the top of the bridge," and defendant threw away the gun and ammunition. The pair then exited on to Thornton Avenue and drove by the area that defendant had stopped with Heredia and Arteaga earlier. Defendant pointed out the location where he had thrown away the incriminating evidence. He said that he threw the items there "because the salt water would get rid of the forensics." Ewert took note of the area.

Continuing on their drive, defendant and Ewert went to a pay phone near a gas station. Ewert observed defendant dialing but failing to complete a call. Eventually, Ewert and defendant went to a motel. As defendant was washing up, Ewert observed defendant "talking out loud, going over all of the things that he had done to get rid of the evidence." Defendant also remembered that "there was a bullet in his room, in the wall from where he tried to shoot his ex-girlfriend." This was important to defendant because "that bullet was the same bullet that was in the gun that he used to kill the police officer." However, defendant and Ewert went to sleep without doing anything about the lodged bullet.

The next morning, Ewert drove defendant around some more. Eventually, the two parted. Ewert then went to an attorney's office and contacted the police. When police officers arrived, Ewert directed them to the area of the marsh that

defendant had pointed out to her the night before. The police subsequently recovered from this location two handguns — one of which was the murder weapon — Heredia and Rangel's IDs, various clothing articles, and an inhaler. The police arrested defendant without incident shortly thereafter.

Niemi died from multiple gunshot wounds. He had been shot in the head, close to his jaw, in the chest, in the abdomen, and in the thigh.

### 2. *Defense case*

The defense focused on establishing that defendant was heavily intoxicated by the time he arrived at Doolittle Drive. The day of the shooting (July 25, 2005) was defendant's twenty-third birthday. Defendant spent much of that day with a friend, Angel Miranda; Miranda's sister, Alina Vallejo; and her husband, Frank Vallejo.[1]

The defense called Miranda, Alina, and Frank to establish how much defendant drank on July 25. Miranda testified that he telephoned defendant at 2:30 or 3:30 p.m. on his birthday and invited defendant to come to his house, where he was living with Alina and Frank. Defendant arrived soon after receiving the call, and Miranda could tell that defendant had been drinking already because defendant was "slurring" and "walking kind of funny." Alina confirmed she "felt he had been drinking" when he came to her house.

Frank arrived home at around 4:15 p.m. and joined Miranda and defendant in drinking beer. Frank estimated that

---

[1]  To avoid confusion, we will refer to people who share a surname — Alina and Frank, as well as members of Niemi's family — by their first names.

defendant had about six beers. Some time around 7:00 or 8:00 p.m., defendant and Miranda left to obtain more liquor. The two stopped at a bar, "drank a couple of beers, played pool, [and] smoked a couple of joints." They then bought a 12- or 18-pack of beer from the liquor store next door. Upon their return to Miranda's residence, Frank saw that defendant had brought bottles of Hennessy and Rémy Martin cognac. Frank and defendant then had a couple of shots from each bottle and "chas[ed] the shots with beer."

At some point during that evening, defendant received a phone call and departed. (This was the call from Heredia concerning the jammed gun.) Frank, Miranda, and Alina were concerned about defendant driving because defendant appeared drunk to them, "slurring" his words and "stumbling around."

The defense similarly elicited from Heredia, Arteaga, Gonzales, Rangel, and Ewert the fact that defendant displayed symptoms of intoxication. The defense queried whether the witnesses thought defendant was drunk and obtained affirmative answers.

Regarding the witnesses' inculpatory testimony, the defense impeached their credibility by confronting them with their prior inconsistent statements. For instance, the defense called attention to the fact that when Heredia talked to the police two days after the shooting, he stated that defendant said, "I don't know, I don't know" when Heredia asked why defendant shot the officer. This was inconsistent with Heredia's trial testimony.

Finally, the defense called to the witness stand Dr. John Treuting, a toxicologist. Treuting testified that based on the information he reviewed, his opinion was that defendant "was

intoxicated at the time of the incident." Treuting also volunteered that individuals who consumed the amount of alcohol that defendant had on the day of the homicide could be expected to experience "mental confusion and lack of critical judgment."

The prosecution sought to undermine Treuting's testimony. For instance, the prosecution ascertained that alcohol affects memory and "[s]o if someone had a good ability to recall[,] that would tend to indicate that the drinks weren't having a significant effect." Treuting acknowledged the prosecution's conclusion "could be" true but cautioned that "there's individual variability."

The prosecution also elicited from the witnesses the fact that defendant still had control of his faculties. For example, the prosecution confirmed that defendant was "walking OK," did not fall down, and was coherent, et cetera.

Based on evidence of defendant's intoxication, the defense argued to the jury that the prosecution had not proved first degree murder because it failed to show that defendant deliberated the crime. "Deliberation," urged the defense, "is just inconsistent with being so drunk that you can't talk normally, you can't drive a car, you can't stand without swaying." The defense stressed evidence of defendant's lack of sobriety and offered more benign explanations for some of defendant's actions. For example, regarding the fact that defendant took some time to produce his identification, the defense acknowledged that one possible inference is that defendant "was stalling." However, "an equally rational interpretation," according to the defense, "is that he was too drunk to manipulate that thing."

By contrast, the prosecution emphasized that defendant's actions were "rational" and "coordinated," thus demonstrating that he deliberated the killing. The prosecution focused on the fact that, before the shooting, "defendant didn't have any problem giving directions" to Arteaga and "was perfectly capable of doing a fairly complex mechanical task of examining [the jammed] gun, and determining why it didn't work." The prosecution also highlighted events following the shooting, including the fact that "after he murdered Dan Niemi," defendant did not "just panic and run." Instead, relying on Ewert's and others' testimony, the prosecutor said that defendant "gathered up some I.D.s, thinking he got his own, so he could avoid detection." Defendant also made the rational decision to discard incriminating evidence and to clean himself with bleach and alcohol swabs. The prosecution referred to the videotape the jury saw of defendant's conduct at Safeway, which showed that about an hour after the shooting, defendant was "walking fine," "making very precise movements," and "executing decisions." The prosecution mentioned Treuting and his testimony that alcohol affects memory. Yet, said the prosecution, defendant's "memory is superb," as indicated by the fact that he remembered the area where he discarded the guns and the lodged bullet from the incident when he tried to shoot his ex-girlfriend. Finally, the prosecution stressed defendant's motive for killing Niemi: to prevent the officer from discovering his probationary search condition and arresting him. The prosecution concluded from all this that defendant "thought it through," and after "weigh[ing] the choices in his mind," chose to "shoot[] a police officer."

Having heard the evidence, the jury returned a guilty verdict and found true the special circumstance allegations that

rendered defendant death eligible.  The case then proceeded to the penalty phase.

## B.  Evidence at the Penalty Phase

### 1. *Prosecution case*

The prosecution introduced victim impact statements and evidence that defendant had once threatened a policer officer and the officer's family.  The victim impact evidence came from Niemi's wife, brother, mother, and three of his fellow police officers.  The witnesses testified generally concerning Niemi's good character and the grief they experienced when he died.

Niemi's wife, Dionne Niemi, recounted that her husband "was a prolific writer."  She authenticated a short story subsequently admitted in evidence as something Niemi had written.

The prosecution also introduced evidence of criminal threats made by defendant. (See § 190.3, factor (b).)  Karl Geser, an officer with the Newark Police Department, testified that in 2001, he was called to a neighborhood disturbance.  Responding to the call, Geser encountered defendant.  Defendant was intoxicated, and Geser arrested him for being drunk in public. When being transported to the police station, defendant "became upset" and "made threats to kill [Geser] and [his] family and [his] kids."  Geser did not bring charges against defendant for making these threats.

### 2. *Defense case*

The defense sought to humanize defendant by introducing details of his life.  Defendant was born in El Salvador to teenage parents during a time of civil unrest.  When he was six or seven years old, his parents immigrated to the United States, leaving defendant in the care of his paternal grandparents.  Although

defendant rejoined his family after a few months' time, his parents eventually divorced. Defendant felt lonely, as his parents "never were there for him, when he need[ed] them."

Defendant developed problems with alcohol abuse in his adolescence. Defendant's mother testified that when he was not drinking, defendant was "friendly and gentle and sweet." However, "when he's drunk . . . he has a very bad temper."

Defendant had strong relationships with his family members, many of whom would maintain contact with him if he were sentenced to life without the possibility of parole. Emphasizing this evidence, the defense pleaded with the jury to spare defendant's life, arguing that defendant was "not an individual that deserves the death penalty, even though he committed this heinous crime."

The jury returned a verdict of death.

## II. Discussion

### A. Guilt Phase Issues

#### 1. Modification of CALCRIM No. 521

##### a. Background

At the request of the prosecution, the trial court modified the standard instruction on the degree of murder. Defendant contends this was reversible error. He bases his argument not only on the language of the instruction itself, but also the prosecution's remarks in closing argument. Accordingly, we examine both in some detail.

The standard instruction, CALCRIM No. 521, defines first degree murder. It specifies that "[t]he defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation." The court modified the

instruction by incorporating verbatim the language of section 189, subdivision (d), which states that "[t]o prove the killing was 'deliberate and premeditated,' it is not necessary to prove the defendant maturely and meaningfully reflected upon the gravity of the defendant's act."[2]

---

[2]    As modified, the portion of the instructions regarding the degree of murder reads:

> "If you decide that the defendant has committed murder, you must decide whether it is murder of the *first* or *second* degree.

> "The defendant is guilty of *first degree* murder if the People have proved that he acted willfully, deliberately, and with premeditation.

> "The defendant acted 'willfully' if he intended to kill — in other words, with *express malice*.

> "The defendant acted 'deliberately' if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.

> "The defendant acted with 'premeditation' if he decided to kill before committing the act that caused death.

> "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test, therefore, is not the length of time, but rather the extent of the reflection.

Both the prosecution and defense expounded on the "maturely and meaningfully reflected" language during closing arguments. The prosecution's comments came within the larger context of an argument regarding the requirements of first degree murder. The prosecution began by repeating the court's instruction that "first degree is willful, deliberate, premeditated" and "the defendant acted deliberately when he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." To illustrate the concept of "willful, deliberate and premeditated decisions," the prosecution gave an example of a juror who was about to be late to court and decided to run a traffic light. After stopping at the intersection and before running the light, the juror "looks in the rearview mirror, looks both ways, looks ahead, sees no police cars, no cars coming, nobody in the intersection, [and then] hits the accelerator." The prosecution stressed that although the juror's actions were "done in a very short period of time," the juror nonetheless "thought about the consequences, being late, getting a ticket, whatever . . . [and] weighed those considerations and [had] gone ahead and done that." Such a juror — said the prosecution — has made a "willful, deliberate,

_____

"To prove the killing was deliberate and premeditated, it is not necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his act.

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you may not find the defendant guilty of first degree murder.

"Any murder which is not proved to be the first degree is murder of the *second* degree."

and premeditated decision." The prosecution then analogized the juror's choice to run the light to defendant's decision to kill Niemi, stating that a variant of his example "is exactly what [defendant] did when he was faced with being arrested and going to jail and decided that wasn't what he wanted to do and shot and killed Officer Niemi to avoid that consequence, just like the juror avoided being late."

The prosecution acknowledged that "the consequences of killing someone are so much greater than the consequences of going through a red light." The prosecution, however, reminded the jury that "part of the instruction that the judge gives you is that to find the killing was willful, deliberate, and premeditated, it is not necessary to prove that the defendant maturely and meaningfully reflected upon the gravity of his act." Focusing on the word "gravity," the prosecution explained, "[G]ravity means the seriousness of or the significance of." Accordingly, "it's not necessary for deliberation and premeditation for the person to reflect on the seriousness of the act meaningfully and maturely. *They just have to know what it is they're doing*, they don't have to reflect on how serious. So whether it's as minor as going through a red light or as serious as killing someone, both acts are willful, deliberate, and premeditated." (Italics added.)

The defense, on the other hand, argued to the jury that "maturely and meaningful reflection . . . probably means that youth and ignorance is not a defense." In other words, "youngsters and fools can engage in the weighing process as much as smart and older people can. And the ultimate decision doesn't have to be a wise one." The defense stressed that whatever the instruction means, "it clearly doesn't diminish from the need for the . . . careful weighing and consideration that deliberation requires." The defense then reviewed the

evidence and asked the jury to find that there was "a reasonable possibility that [defendant] was too drunk" "to have deliberated."

Unsurprisingly, the prosecution took a different view. The prosecution underscored how defendant's various actions showed that he thought "clearly" and "rationally" about killing the officer — including his firing multiple shots at Niemi, his efforts at avoiding detection, his coordinated movement and decisionmaking as shown by video taken at Safeway, and his statements to others that he killed Niemi because Niemi would have discovered his "search and seizure" condition. The prosecution concluded by stating that defendant had "more than enough time to weigh the consequences, [to] make a cold, calculated decision to kill. And that's what this defendant did, and that's first-degree murder."

### b. *Analysis*

Defendant contends the court's modification of CALCRIM No. 521 amounts to reversible error under both statutory and constitutional law. He argues that the modified instruction was erroneous because "the added language, although contained in section 189, does not set forth a principle of law applicable to this case." He further claims that the instruction "was ambiguous and likely confused and misled the jury about the mental state required for deliberate and premeditated murder." Finally, he asserts that the effect of the instruction "was to lower the prosecutor's burden of proof and violate [defendant's] right to a jury trial on the mental state elements of deliberate and premeditated murder."

As a preliminary matter, we note that defense counsel did not lodge a specific objection to the court's modification of

CALCRIM No. 521. To the extent defendant argues that the trial court erred in instructing the jury in a way that affected his substantial rights, however, defendant's argument may still be heard on appeal. (See § 1259; *People v. Johnson* (2015) 60 Cal.4th 966, 993.)

On the merits, we cannot agree that CALCRIM No. 521 was erroneously modified. As defendant acknowledges, we have previously confronted — and rejected — seemingly the same claims as those he now raises. In *People v. Smithey* (1999) 20 Cal.4th 936, 955 (*Smithey*), we reviewed the first degree murder conviction of an individual who did not dispute that he killed the victim but contested that he deliberated and premeditated the killing. As here, the trial court in *Smithey* modified "the standard instruction regarding deliberate and premeditated murder" by adding the statement, " 'To prove the killing was deliberate and premeditated, it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his act.' " (*Id.* at p. 979.) On appeal to the Supreme Court, Smithey argued that the modified instruction "was reasonably likely to have confused the jury regarding the mental state required for deliberate and premeditated murder." (*Id.* at p. 980.) Smithey also contended that the instruction "lowered the prosecution's burden of proof and denied him the right to a jury determination on the mental state elements . . . in violation of the [federal and state Constitutions]." (*Ibid.*)

We rejected Smithey's claims. (*Smithey*, *supra*, 20 Cal.4th at pp. 981–982.) We began with the principle that the trial court in this case cited, that " ' "[t]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction . . . ." ' " (*Id.* at p. 980, quoting *People v.*

*Estrada* (1995) 11 Cal.4th 568, 574; see also *People v. Poggi* (1988) 45 Cal.3d 306, 327 ["If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language"].) We reasoned that this well-settled principle applies with regard to section 189, subdivision (d)'s "maturely and meaningfully reflected" language because those words "are commonly understood terms" and "[c]onsidering the instructions as a whole, [there was] no reasonable likelihood that the jury misunderstood the phrase 'maturely and meaningfully reflected' in the manner suggested by defendant." (*Smithey*, *supra*, 20 Cal.4th at p. 981.) On this latter point, we stressed the fact that the trial court instructed the jury on the definitions of "deliberate" and "premeditated" and excluded " 'a mere unconsidered and rash impulse' from the definition of deliberation." (*Ibid.*)

Defendant's claims may be rejected on the same grounds. The modification here was taken verbatim from statutory language. Because the statute's language was stated in "commonly understood terms," the presumption is that jury may be instructed in those terms. (See *Smithey*, *supra*, 20 Cal.4th at pp. 980–981.) Likewise, the trial judge in this case instructed on the meaning of deliberation and premeditation, informing jurors that "defendant acted 'deliberately' if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill" and that he "acted with 'premeditation' if he decided to kill before committing the act that caused death." In addition, the court stated that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

When the instructions are considered as a whole,[3] there is no reasonable likelihood that the jury "misunderstood and misapplied the mental state required for deliberate and premeditated murder." (Accord, e.g., *Smithey, supra,* 20 Cal.4th at pp. 963–964 ["If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. [Citations.] ' " ' [T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " ' "].) The jury knew that to convict defendant of first degree murder, it must find that he deliberated and premeditated the killing. The jury also knew that if defendant had made the decision to kill "rashly, impulsively, or without careful consideration," then he had not deliberated and premeditated the killing. As such, whatever meaning the jury ascribed to the phrase "maturely and meaningfully reflected on the gravity of his act," it reasonably understood that the phrase was not synonymous with a decision to kill that was "rash, impulsive and [with little or no consideration of] the consequences." (Accord, e.g., *People v. Gonzales* (2011) 51 Cal.4th 894, 940 ["It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions"].) Contrary to defendant's assertion, therefore, the modification to CALCRIM No. 521 did not dilute the requirement that

---

[3]    Indeed, the court directed the jury to do just that: examine the instructions holistically. As the court stated, jurors are to "[p]ay careful attention to all of these instructions and consider them together." The prosecution echoed the court's charge, urging jurors to "do as the judge told you, and look at the instructions as a whole."

defendant must have carefully considered the decision to kill. By the same token, the modified instruction did not lower the prosecution's burden of proof regarding deliberation and premeditation; nor did it deprive defendant of his right to a jury determination on this issue. (See *Smithey*, *supra*, 20 Cal.4th at p. 981.)

Defendant attempts to distinguish *Smithey* in several ways. First, he asserts that the modified instruction was proper in *Smithey* because the defendant in that case "presented a dual defense of mental impairment and drug intoxication." By contrast, defendant presented "a simple intoxication defense." According to defendant, "there was not the slightest justification for instructing in the 'maturely and meaningfully reflected' language" under such circumstances.

Defendant bases this argument on the history of section 189. The phrase "maturely and meaningfully reflected" in section 189, subdivision (d) finds its genesis in *People v. Wolff* (1964) 61 Cal.2d 795. (See *Smithey*, *supra*, 20 Cal.4th at p. 979; *People v. Dunkle* (2005) 36 Cal.4th 861, 911–912 (*Dunkle*); *People v. Stress* (1988) 205 Cal.App.3d 1259, 1269–1270.) In *Wolff*, we held that "the true test [for deliberation and premeditation] must include consideration of the somewhat limited extent to which this defendant [a 15-year-old diagnosed schizophrenic] could *maturely and meaningfully reflect* upon the gravity of his contemplated act." (*Wolff*, *supra*, 61 Cal.2d at p. 821.) The decision in *Wolff* thus made mature and meaningful reflection part of the deliberation and premeditation analysis.

In 1981, the Legislature abrogated *Wolff*'s holding. (*Smithey*, *supra*, 20 Cal.4th at p. 979.) At the same time, it

abolished the defense of diminished capacity. (Stats. 1981, ch. 404, § 4, p. 1592 [enacting Pen. Code, § 28].) In eliminating that defense, the Legislature provided that "evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged." (§ 25, subd. (a); see also § 29.4, subds. (a), (b) [providing that "[e]vidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged" and that such evidence "is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought"]; § 28, subd. (a) [similar provision regarding "[e]vidence of mental disease, mental defect, or mental disorder"]; *People v. Saille* (1991) 54 Cal.3d 1103, 1111–1112 [discussing the legislative history behind the various provisions]; *People v. Elmore* (2014) 59 Cal.4th 121, 141–144 [discussing the case law leading to the enactment of the above statutory provisions].)

From this history, defendant asks us to draw the conclusion that the "maturely and meaningfully reflected" language is not a proper basis for a jury instruction when a defendant's "mental capacity" is not at issue. Defendant contends this is so even though he mounted an "intoxication defense" at trial. Defendant thus distinguishes between mental incapacity — a term that he uses to refer to mental disorders or defects — and voluntary intoxication.

We disagree that such a distinction is appropriate for the purposes here. The diminished capacity defense subsumed both

forms of diminishment, applying when "a defendant's voluntary intoxication *or* mental defect may have prevented him from forming the mental state required for the charged offense." (*Dunkle, supra,* 36 Cal.4th at pp. 910–911, italics added.) Because the law of diminished capacity applied both to intoxication and mental defects, the Legislature's abrogation of the diminished capacity and *Wolff*'s requirement for mature and meaningful reflection is properly understood to have eliminated that defense in every factual context in which it could have been raised. The history of the legislative changes in this area thus lends no credence to the argument that a "maturely and meaningfully reflected" instruction is appropriate when a defendant claims some form of mental "incapacity" (as in *Smithey*) but not when a defendant relies on a "simple intoxication defense."[4]

Defendant further attempts to distinguish *Smithey* by focusing on the prosecution's closing argument. According to defendant, the prosecutor here, unlike the prosecutor in *Smithey*, told the jury that an intent to kill was sufficient to satisfy the deliberation and premeditation standard because he said that individuals charged with first degree murder "just have to know what it is they're doing." (Cf., e.g., *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 [" ' "A verdict of

---

[4] Moreover, defendant is incorrect that the concept of mature and meaningful reflection was outside the ambit of proper jury instruction on the facts of this case. Because an individual may fail to maturely and meaningfully reflect on the gravity of an act due to intoxication and defendant argued he was intoxicated at the time of the crimes, the prosecution was entitled to seek an instruction clarifying it did not need to prove that defendant engaged in such reflection to establish that he premeditated and deliberated his act.

deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance" ' "].)

Defendant did not object to the statement when it was made, instead choosing to rebut the prosecutor's remarks in closing argument. Even putting aside the failure to object, we are not persuaded that the prosecutor misstated the law. The challenged statement came in the middle of the prosecutor's attempt to explain the word "gravity" as that word is used in the instruction that "[t]o prove the killing was 'deliberate and premeditated,' it is not necessary to prove the defendant maturely and meaningfully reflected upon the gravity of the defendant's act." (§ 189, subd. (d).) The prosecutor equated "the gravity of the defendant's act" with the seriousness of the act. (*Ibid.*) The prosecutor thus said that the instruction means "it's not necessary for deliberation and premeditation for the person to reflect on the seriousness of the act meaningfully and maturely." Instead, "[t]hey just have to know what it is they're doing, they don't have to reflect on how serious." "[W]hether [an act is] as minor as going through a red light or as serious as killing someone," the prosecutor added, "both acts [can meet the standard of being] willful, deliberate, and premeditated." Hence, the thrust of the prosecutor's remarks is not that defendant did not need to think seriously about what it is he was doing; instead, it is that defendant did not need to think maturely and meaningfully about the seriousness of the act he was performing. Properly understood, the prosecutor did not suggest to the jury that the mental state required for first degree murder is simply intent to kill.

Other portions of the prosecutor's closing argument bolster this conclusion. The prosecutor's statement that defendants "just have to know what it is they're doing" was an isolated comment within the context of a long argument in which the prosecutor stressed that the defendant weighed the consequences of his action and, as such, "deliberated" the killing. For example, in analogizing the juror's decision to run a red light to defendant's decision to kill Niemi, the prosecutor emphasized that the juror had "thought about the consequences, being late, getting a ticket . . . [and] weighed those considerations and [had] gone ahead." Elsewhere, the prosecution focused on defendant's "thought process," reminding the jury time and again that defendant thought that he was going to get arrested after handing Niemi his identification, and hence to avoid arrest and jail time, he killed Niemi. Toward the end of his closing argument, the prosecutor stressed once more that defendant "thought it through" and "weighed the consequence of going to jail against killing a police officer." The prosecutor's last comment was to impress upon the jury that defendant had "more than enough time to weigh the consequences, [and to] make a cold, calculated decision to kill." The overall content and tenor of the prosecutor's remarks thus could not reasonably be taken as conveying that a mere intent to kill suffices for deliberate and premeditated first degree murder.

Moreover, the phrasing defendant plucks from the context of the prosecutor's closing argument must also be considered alongside the court's instructions and the defense's argument. (Accord, *Smithey, supra,* 20 Cal.4th at p. 987; *People v. Young* (2005) 34 Cal.4th 1149, 1202 (*Young*) ["The reviewing court also must consider the arguments of counsel in assessing the

25

probable impact of the [challenged] instruction on the jury"].) The court told the jurors that if they "believe that the attorney's comments on the law conflict with [the court's] instructions, [jurors] must follow [the] instructions." The defense likewise told the jury that "deliberate can't be whatever [the prosecutor] says"; nor can it be "whatever he wants you to believe." The defense subsequently explained to the jury the meaning of "meaningfully and maturely reflect on the gravity of [one's] act." Importantly, the defense maintained that whatever the instruction means, "it clearly doesn't diminish from the need for the true reflect[ion], the careful weighing and consideration that deliberation requires." And as noted, the prosecutor never disputed that he needed to show that defendant weighed the consequences of his action. Against this backdrop, we do not think the prosecutor's isolated remark materially distinguishes this case from *Smithey*.

Finally, in his reply brief, defendant highlights the fact that the court in *Smithey* instructed the jury with CALJIC language whereas the court here used CALCRIM language. Defendant argues that this circumstance makes his case different from *Smithey* because "[i]t cannot be assumed that a modification of a CALJIC instruction can be made to the replacement CALCRIM instruction." Defendant cites no authority to support the proposition that, as a doctrinal matter, CALJIC instructions may be modified with statutory language but CALCRIM instructions may not. Furthermore, we are not persuaded that the modified instruction is inappropriate when considered alongside the CALCRIM instructions the trial court relied upon. If anything, the court's other instructions served to illustrate the meaning of deliberation and premeditation and so

alleviated any confusion that may have been caused by the modification to CALCRIM No. 521. (See *ante*.)

For these reasons, we conclude that the trial court did not err in modifying CALCRIM No. 521 by incorporating statutory language from section 189.

> 2. *Instruction on reasonable doubt concerning the degree of murder*
>
> a. *Background*

At trial, defendant requested that the court instruct the jury with CALJIC No. 8.71. At the time, the instruction stated, "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." (CALJIC No. 8.71 (6th ed. 1996).)

The court denied the request, reasoning that the CALCRIM instructions that it was using to instruct the jury already "adequately covered" the content of CALJIC No. 8.71. The court subsequently instructed the jury with CALCRIM No. 521, which, in relevant part, provides: "If you decide that the defendant has committed murder, you must decide whether it is murder of the first or second degree. . . . The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you may not find the defendant guilty of first degree murder. Any murder which is not proved to be the first degree is murder of the second degree."

The court also gave the pattern instruction on reasonable doubt, CALCRIM No. 220. The instruction specifies that "a defendant in a criminal case is presumed to be innocent. This presumption places upon the People the burden of proving him guilty *beyond a reasonable doubt*. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. . . . Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

In addition, the court referenced the concept of reasonable doubt when it gave CALCRIM No. 225. The instruction covers the use of circumstantial evidence to establish intent or mental state. It states:

> "The People must . . . prove not only that the defendant did the acts charged, but also that he acted with a particular intent or mental state. . . .

> "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

> "Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent or mental state. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the

defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent or mental state was not proved by the circumstantial evidence."

Both the prosecution and defense expounded on the meaning of reasonable doubt. The defense in particular stressed that "the law requires [jurors to] give the benefit to [defendant]" if they reasonably harbor doubt concerning whether defendant committed first degree murder. The defense further conveyed that the only true issue in the case was the degree of the murder. That is, the defense did not contest that defendant murdered Niemi, instead urging the jury to find he was guilty of only second degree murder.

The jury found against defendant, convicting him of murder in the first degree.

### b. Analysis

On appeal, defendant argues the trial court's refusal to give CALJIC No. 8.71 warrants reversal of his convictions. Defendant contends the instruction is required under section 1097 as well as our decision in *People v. Dewberry* (1959) 51 Cal.2d 548 (*Dewberry*). Section 1097 states: "When it appears that the defendant has committed a public offense, or attempted to commit a public offense, and there is reasonable ground of doubt in which of two or more degrees of the crime or attempted crime he is guilty, he can be convicted of the lowest of such degrees only." *Dewberry* likewise affirms that "when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the [jurors] must be instructed that if they entertain a reasonable doubt as to

which offense has been committed, they must find the defendant guilty only of the lesser offense." (*Dewberry*, *supra*, 51 Cal.2d at p. 555.)

We conclude that the trial court's instructions to the jury in this case appropriately conveyed the principle embedded in section 1097 and *Dewberry*. As noted, the court instructed the jury with CALCRIM No. 521. The jury was thus told that if it found defendant guilty of murder, it must determine "whether it is murder of the first or second degree." Because the defense did not dispute that defendant murdered Niemi, the jury knew it must decide whether defendant committed first or second degree murder. On this issue, the jury was informed that "[t]he People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime." It was also told "[i]f the People have not met this burden, you may not find the defendant guilty of first degree murder" and "[a]ny murder which is not proved to be the first degree is murder of the second degree." So instructed, reasonable jurors would have grasped that if they harbored a reasonable doubt "that the killing was first degree murder," then the People had not discharged their burden to prove such murder. When that happens, jurors "may not find defendant guilty of first degree murder" and must return a verdict of second degree murder. In sum, reasonable jurors would have understood that if they have reasonable doubt that the murder was of the first degree, they must find defendant guilty "only of the lesser offense" of second degree murder. (*Dewberry*, *supra*, 51 Cal.2d at p. 555; accord, e.g., *People v. Buenrostro* (2018) 6 Cal.5th 367, 431 (*Buenrostro*) ["We presume jurors understand and follow the instructions they are given"].)

Defendant concedes that CALCRIM No. 521 at least "implicit[ly]" delivers this message to the jury. He nonetheless argues that an explicit instruction in the form of CALJIC No. 8.71 was needed. We find no merit in defendant's claim.

We begin by noting that the trial court instructed the jury using CALCRIM instructions.[5] The Judicial Council's official guide for using the CALCRIM instructions expressly cautions against mixing CALCRIM and CALJIC instructions. As the Judicial Council has stated, "The CALJIC and CALCRIM instructions should *never* be used together. While the legal principles are obviously the same, the organization of concepts is approached differently. Mixing the two sets of instructions into a unified whole cannot be done and may result in omissions or confusion that could severely compromise clarity and accuracy." (Judicial Council of Cal., Crim. Jury Instns. (2020) Guide for Using Judicial Council of Cal. Crim. Jury Instns., p. xxii; see also, e.g., *People v. Leon* (2020) 8 Cal.5th 831, 849, fn. 9 [referencing this warning]; *People v. Beltran* (2013) 56 Cal.4th 935, 943, fn. 6 [same].)

We further agree with the court that because the content of CALJIC No. 8.71 was "adequately covered" by another instruction (CALCRIM No. 521), there was no need to also instruct with the language of CALJIC No. 8.71. (See, e.g., *People v. San Nicolas* (2004) 34 Cal.4th 614, 675 ["a judge need not include a legally correct jury instruction when it is duplicative of other instructions provided to the jury"]; *People v. Barajas* (2004) 120 Cal.App.4th 787, 791 ["The court has no duty to give

---

[5]     These pattern instructions are "approved by the Judicial Council" and "are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050(a).)

an instruction if it is repetitious of another instruction also given"].) CALJIC No. 8.71 informs jurors that if they are convinced that a defendant committed murder but "unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." As we have explained, CALCRIM No. 521 relates the same information, advising jurors that if they are convinced that a defendant committed murder but harbor a reasonable doubt regarding whether he or she committed first degree murder, they must return a verdict for second degree murder. In short, the substance of CALJIC No. 8.71 is conveyed by CALCRIM No. 521.[6]

Defendant resists this conclusion, attempting to liken his case to *Dewberry*. In *Dewberry*, we reversed the defendant's conviction for second degree murder because the trial court did not charge that "in the case of a reasonable doubt as between second degree murder and manslaughter, defendant was to be found guilty of manslaughter." (*Dewberry*, *supra*, 51 Cal.2d at pp. 558, 550, 555.) We acknowledged that the trial court had

---

[6] Subsequent to defendant's trial, we held that "the better practice is not to use the 1996 revised versions of CALJIC Nos. 8.71 and 8.72, as the instructions carry at least some potential for confusing jurors." (*People v. Moore* (2011) 51 Cal.4th 386, 411.) The potential for confusion, however, comes from the portion of the instructions concerning unanimous agreement about reasonable doubt ("you unanimously agree that you have a reasonable doubt" (CALJIC No. 8.71)) and does not affect defendant's argument here. (See *Moore*, at p. 411; *Buenrostro*, *supra*, 6 Cal.5th at pp. 429–431; *People v. Salazar* (2016) 63 Cal.4th 214, 246–248.)

given other instructions regarding reasonable doubt, including: (1) the "defendant was presumed innocent of any crime until the contrary had been proved, and in case of reasonable doubt, was entitled to an acquittal, and that the presumption of innocence attaches at every stage of the case and to every fact essential to a conviction;" (2) "if the jurors were convinced beyond a reasonable doubt that defendant had committed the crime of murder but entertained a reasonable doubt as to the degree, they should give defendant the benefit of the doubt and find him guilty of second degree murder;" and (3) "if [the jurors] were in doubt as to whether the killing was manslaughter or justifiable homicide, defendant was to be acquitted." (*Id.* at p. 554.) We found that these instructions were inadequate because "[t]he failure of the trial court to instruct on the effect of a reasonable doubt as between any of the included offenses, when it had instructed as to the effect of such doubt as between the two highest offenses, and as between the lowest offense and justifiable homicide, left the instructions with the clearly erroneous implication that the rule requiring a finding of guilt of the lesser offense applied only as between first and second degree murder." (*Id.* at p. 557.)

No similar erroneous implication inheres in this case. As the Attorney General correctly points out, "second degree murder was the only lesser included offense available to [defendant's] jury." Moreover, the jury was instructed with an instruction which refers specifically to first and second degree murder. Accordingly, there was no reasonable likelihood that the jury misapprehended "that the rule requiring a finding of guilt of the lesser offense applied only as between [some crimes other than] first and second degree murder." (*Dewberry, supra,* 51 Cal.2d at p. 557.)

Rather than being analogous to *Dewberry*, defendant's case is more like *People v. Friend* (2009) 47 Cal.4th 1 and *People v. Musselwhite* (1998) 17 Cal.4th 1216. In *Friend* and *Musselwhite*, we found that the omission of CALJIC No. 8.71 did not amount to instructional error when the trial court instructed on other relevant concepts of reasonable doubt. (*Friend*, *supra*, 47 Cal.4th at pp. 55–56; *Musselwhite*, *supra*, 17 Cal.4th at pp. 1262–1963.) These cases make clear that CALJIC No. 8.71 is not the sine qua non of a murder trial, even in litigation in which the degree of murder is in dispute.

Here, the jury was instructed with, inter alia, CALCRIM No. 521 (definition of first degree murder), CALCRIM No. 220 (the standard instruction on reasonable doubt), and CALCRIM No. 225 (the use of circumstantial evidence to establish mental state). These instructions — stressed by the defense during closing argument — are materially the same as the instructions given in *Friend* and *Musselwhite*. In line with our precedent, therefore, we find no error in the trial court's refusal to instruct with CALJIC No. 8.71.

### 3. *Uniformed police officers present as spectators*

#### a. *Background*

Before jury proceedings began, defendant filed a motion to exclude uniformed police officers from the courtroom. Citing the concern that "a police presence in jury proceedings would . . . affect defendant's right to a fair trial," the defense requested that "any police officer who attends as a spectator at any stage of the trial when a juror or prospective juror is present be ordered to wear civilian clothing."

The court denied the motion, declining to "rule prospectively that uniformed police officers can't come in and

watch this trial." The court explained that a "police officer . . . who just gets off duty or is going to go on-duty, who wants to come in and watch a little bit of the trial, may be wearing a uniform for that reason." The court thought it unnecessary to force such persons "to go change clothes" before coming to the courtroom. Nonetheless, the court reiterated that it understood defendant's concerns and would not "permit . . . any spectators to simply stand in the courtroom" nor "allow the back wall to be lined with uniformed officers." The court also left open the possibility of revisiting the issue if the presence of uniformed police officers became "over done" at trial.

On the morning of jury instructions and closing arguments, the defense once again brought up the issue of uniformed officers in the courtroom. A motion was made and considered off record. After jury instructions were delivered and arguments had commenced, the court invited defense counsel to memorialize the motion. Defense counsel then stated for the record that the gallery "was full of people" and "there was some 17 or 18 uniformed San Leandro police officers in the gallery." Counsel further stated that there was "a juror who is unable to use the stairs . . . and has to go through the gallery." Counsel explained that he felt the situation "should have been controlled" and asked the court "earlier today to do something . . . to limit the number of uniformed officers or somehow ameliorate that effect."

Before putting its ruling on the record, the court clarified the argument it heard. The court asked if defense counsel's "position is basically that it's unduly prejudicial to your client to have so many unformed officers in the gallery at this time." Counsel confirmed that it was. The court thereafter explained it denied counsel's request because it did not "see any undue

prejudice to the defendant." The court supported its ruling by pointing to several circumstances. First, "it's not a secret that this is a case involving the killing of a peace officer." Second, the court has rearranged the seating in a way that "tended to reduce the [prejudicial] effect to which [defendant] referr[ed]." In particular, the court had "put the defendant's family in the front row behind the bailiff" and "nonuniformed people in the front row . . . behind the jurors." Although there were still uniformed officers in the front row on the defense side, the court viewed this seating arrangement as achieving the benefit of making uniformed officers less prominent. Third, the court has "witnessed no conduct in the courtroom that [it] considered to be in any way intimidating . . . or having an effect of drawing attention to the uniforms in the courtroom."

The defense subsequently addressed the jury regarding the presence of uniformed police officers. Defense counsel told the jury that "[t]o the extent you may feel some public pressure, acknowledging that we have a gallery full of police officers, that's not appropriate." Counsel alerted jurors that they were "not here to send a message to anybody" and "to the extent that you feel influenced by that, I would not only reject it, I would resent it and ignore it." Jurors "got a job to do and it has nothing to do with anything other than the evidence and the law in this case."

Counsel's remarks echoed the court's instructions. As part of its charge to the jury, the court stated: "You must decide what the facts are. It is up to you alone to decide what happened, based only on the evidence that has been presented to you in this trial. Do not let bias, sympathy, prejudice, or public opinion influence your decision."

### b. *Analysis*

Defendant asserts that the trial court abused its discretion in permitting 17 or 18 uniformed officers to attend trial as spectators on the day of jury instructions and closing arguments for the guilt phase. Defendant makes two related claims regarding the court's purported error.

Defendant first argues that the trial court abused its discretion by failing to exercise it. The claim is without merit. Nothing in the court's exchange with counsel suggests that it did not understand that it had the " 'broad power to maintain courtroom security and orderly proceedings.' " (*People v. Stevens* (2009) 47 Cal.4th 625, 632 (*Stevens*); see also § 1044 ["It shall be the duty of the judge to control all proceedings during the trial"].) When defense counsel first brought up the issue of uniformed police officers attending courtroom proceedings, the court indicated that it understood counsel's concern and would restrict the number of people in the courtroom so that "the back wall [will not] be lined with uniformed officers." The court otherwise refused to "rule prospectively that uniformed police officers can't come in and watch this trial" because it thought there were legitimate reasons why an officer might come to the courtroom in his or her uniform. The court nonetheless recognized that the presence of uniformed police officers may become problematic or "over done" and expressly allowed counsel to raise the issue again should that happen.

The court similarly engaged in a thoughtful and calibrated response when the defense renewed the motion on the day of closing argument. The court indicated that it understood defendant was concerned about the prejudice that might result from the officers' visible presence. The court specifically

mentioned the possibility that the officers' attendance may be perceived as "intimidating" but noted that it has not "witnessed [any] conduct" tending to produce such an effect, or even "of drawing attention to the uniforms in the courtroom."

The court further explained why it did not think the officers' attendance as spectators prejudiced defendant. As the court observed, the jurors were well aware that "this is a case involving the killing of a peace officer." We cannot agree with defendant that this statement "was not responsive to [his] motion." "Any discretionary ruling must take into account the particular circumstances of the individual case and will be reviewed in that context." (*Stevens*, *supra*, 47 Cal.4th at p. 637.) Certainly, a "particular circumstance[]" of this case is that it involved a killing of a peace officer. (*Ibid.*) Thus, one reasonable interpretation of the court's remark is that the court did not think the officers' presence would result in undue prejudice because, knowing that "this is a case involving the killing of a peace officer," the jury expected officers to attend the proceedings. As such, under the court's view, jurors were not likely to feel coerced or overly emotional when that expectation was met.

Finally, the court took ameliorative action. The court rearranged the seating so that the front row behind the bailiff was occupied by defendant's family members and the front row closest to the jurors was cleared of uniformed police officers. The court stated that the directed seating made the officers less prominent. The court's sensitivity to the officers' location vis-à-vis the jury indicates that the court exercised its reasoned judgment — and discretion — when considering defendant's motion.

Defendant next argues that the trial court abused its discretion and thereby deprived him of a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution in denying his motion to limit the number of uniformed officers in the courtroom. Defendant bases his argument on a line of cases from the United States Supreme Court addressing "state-sponsored courtroom practices" that have been challenged as "inherently prejudicial" to a defendant's constitutional right to a fair trial. (*Carey v. Musladin* (2006) 549 U.S. 70, 76 (*Musladin*).) In *Estelle v. Williams* (1976) 425 U.S. 501, 502, for instance, the high court considered the custom whereby "an accused . . . is compelled to wear identifiable prison clothing at his trial by a jury . . . ." The court held that, even absent a showing of actual prejudice, "an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption [of innocence] so basic to the adversary system." (*Id.* at p. 504.) In other words, compelling a defendant to appear before a jury in prison garb is inherently prejudicial, and unless justified by an "essential state policy," is deemed a violation of due process. (*Id.* at p. 505; see also *Estes v. Texas* (1965) 381 U.S. 532, 542–543 ["It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process"].)

The court evaluated yet another state-sponsored courtroom practice in *Holbrook v. Flynn* (1986) 475 U.S. 560, 569 (*Flynn*). There, the petitioner challenged as inherently prejudicial the fact that at his trial, "the customary courtroom security force was supplemented by four uniformed state

troopers sitting in the first row of the spectators' section." (*Id.* at p. 562.) The uniformed troopers were present because the court marshals lacked the capacity to provide the preferred two-officers-per-defendant ratio for the six defendants at trial and a union contract prevented the troopers from working out of uniform. (*Id.* at pp. 564–565.) Given that the six defendants had been denied bail and thus arguably presented a flight risk, the trial court had denied the petitioner's motion to remove the state troopers. (*Id.* at p. 565.)

In reviewing the decision, the high court held that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" (*Flynn*, *supra*, 475 U.S. at p. 568) is not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest" (*id.* at pp. 568–569). This is because of the "wide[] range of inferences that a juror might reasonably draw from the officers' presence." (*Id.* at p. 569.) In particular, the presence of the officers "need not be interpreted as a sign that [the defendant] is particularly dangerous or culpable," because "[i]f they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status." (*Ibid.*)

The court thus proceeded to a case-specific analysis addressing whether the precise courtroom arrangement that the petitioner challenged as inherently prejudicial involved " 'an unacceptable risk . . . of impermissible factors coming into play.' " (*Flynn*, *supra*, 475 U.S. at p. 570.) The court cautioned that "[w]e do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial." (*Id.* at pp. 570–571.) But it

concluded that the mere four uniformed troopers in the context of the six-defendant trial were "unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." (*Id.* at p. 571.) And even if the court were able to discern a "slight degree of prejudice," the presence of the troopers was justified by "the State's need to maintain custody over defendants who had been denied bail." (*Ibid.*)

Defendant asks us to find that the presence of 17 or 18 uniformed officers as spectators on the final day of his trial was inherently prejudicial. As a threshold matter, we note the high court's position that "[i]n contrast to state-sponsored courtroom practices, the effect on a defendant's fair-trial rights of the spectator conduct . . . is an open question . . . ." (*Musladin*, *supra*, 549 U.S. at p. 76.) The high court itself "has never addressed a claim that . . . private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial" or applied the test for inherent prejudice in *Williams* and *Flynn* to spectators' conduct. (*Ibid.*)

Although the parties disagree about whether the presence of uniformed police officers in the courtroom constitutes a state-sponsored practice or private spectators' conduct, the disposition of defendant's claim does not depend on this distinction. Without directly addressing the question left open by the United States Supreme Court, our case law appears to have treated even private-actor courtroom conduct as implicating the standard of inherent prejudice articulated in *Williams* and *Flynn*. (See, e.g., *People v. Myles* (2012) 53 Cal.4th 1181, 1215–1216.) And of particular relevance in this setting, we have said that "[i]n determining whether the presence of uniformed officers [as spectators] denies a defendant's right to a fair trial,

a reviewing court must look 'at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 757 (*Woodruff*) [quoting *Flynn*]; but see *People v. Cummings* (1993) 4 Cal.4th 1233, 1298–1299 [addressing the impact of uniformed officers in the courtroom without considering inherent prejudice or citing *Williams* or *Flynn*].) Because the Attorney General maintains that defendant's claim fails even under the "inherent prejudice" test, we will assess defendant's claim under that standard.

We evaluate the level of prejudice attributable to a particular courtroom scene based on the " 'totality of the circumstances.' " (*Woods v. Dugger* (11th Cir. 1991) 923 F.2d 1454, 1457 (*Woods*), quoting *Sheppard v. Maxwell* (1966) 384 U.S. 333, 352.) As relevant here, those circumstances may include the number of uniformed officers present, the location and grouping of the officers in the gallery, the ratio of uniformed officers to plainclothes spectators, the officers' conduct, the charged crime, the arguments of counsel, and the local community's relationship with law enforcement officers. Our evaluation of all such circumstances must be informed by "our own experience and common sense." (*Flynn, supra*, 475 U.S. at p. 571, fn. 4.) "[T]he question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk [was] presented of impermissible factors coming into play.' " (*Id.* at p. 570.) At the same time, we consider whether the discernible "degree of prejudice" was justified by other interests, such as the officers'

right to attend trial like any other member of the public. (*Id.* at p. 571.) Ultimately, our review must be deferential to the trial court, whose handling of the challenged scene we evaluate only for abuse of discretion. (*Woodruff, supra,* 5 Cal.5th at p. 757.)

We conclude that the presence of uniformed police officers at defendant's trial was not inherently prejudicial because defendant has not demonstrated on this record that there was " 'an unacceptable risk . . . of impermissible factors coming into play.' " (*Flynn, supra,* 475 U.S. at p. 570.) The record reveals that there were 17 or 18 uniformed police officers in the courtroom on the day of closing arguments. "We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial," and we recognize that 17 or 18 officers may well have been a palpable presence. (*Id.* at pp. 570–571; accord *Phillips v. State* (Alaska Ct.App. 2003) 70 P.3d 1128, 1137–1138 [stating that the "appearance of law enforcement officers *en masse* in the spectator gallery posed a threat that the jurors would feel implicit pressure to return a verdict favorable to law enforcement interests or sentiment," but finding no error where trial court limited number of uniformed officers to five].) Balanced against this raw number, however, is the fact that the gallery was "full," and there is no evidence concerning the ratio of uniformed officers to nonuniformed spectators. (Accord, *Howard v. State* (Tex.Crim.App. 1996) 941 S.W.2d 102, 118 (*Howard*) ["this Court cannot hold that the mute and distant presence of twenty peace officers — comprising roughly one-fifth of the spectator gallery — is prejudicial, per se, without some other indication of prejudice"]; *Davis v. State* (Tex.App. 2006) 223 S.W.3d 466, 474 (*Davis*) [similar]; *Lambert v. State* (Ind. 2001) 743 N.E.2d 719, 731–732; *Meadows v. State* (Ind.Ct.App.

2003) 785 N.E.2d 1112, 1124 ["The trial court did not abuse its discretion by allowing up to ten uniformed officers to be present in the courtroom at one time"].) Accordingly, the record does not indicate that the number of uniformed officers alone had an outsized effect on " 'the scene presented to jurors.' " (*Woodruff*, *supra*, 5 Cal.5th at p. 757.)

The record points to two additional circumstances that possibly favor defendant's claim of inherent prejudice: first, defense counsel's observation that there was "a juror who . . . ha[d] to go through the gallery" and second, that some officers sat in the front row behind the defense. Still, there is no evidence concerning when the juror passed through the gallery or that the officers reacted to the juror's proximity. In fact, the trial court's remarks on the record suggest they did not. And there were no uniformed officers sitting in the front row on the jury side.

Cutting against a finding of inherent prejudice are the trial court's observations. As the trial court commented, it "witnessed no conduct in the courtroom that [it] considered to be in any way intimidating . . . or having an effect of drawing attention to the uniforms in the courtroom." To be sure, the court's remark is not dispositive. Jurors may have been influenced by the mere presence of the officers even if they did not believe that the officers were conducting themselves in such a way as to intimidate them. Yet, the mere possibility of such influence is not enough to render the officers' attendance inherently prejudicial. (See *Flynn*, *supra*, 475 U.S. at p. 569.) And even though not dispositive, the court's remark is relevant in assessing " 'the scene presented to jurors and . . . whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial.' "

(*Woodruff, supra*, 5 Cal.5th at p. 757.)  Here, the fact that the court did not observe any improper conduct — indeed any conduct even to draw the jury's attention to the officers — tends to undermine the claim that defendant's trial was fundamentally unfair.

In addition, the court specifically rearranged the seating so that uniformed officers would not sit the row closest to the jury.  (See, e.g., *Davis, supra*, 223 S.W.3d at p. 474; *Lemley v. State* (1980) 245 Ga. 350, 353–354 [264 S.E.2d 881, 884] [finding no abuse of discretion when the trial judge "require[d] the police officers to vacate some of the rows in the front and middle sections of the courtroom" and "did not allow anybody to sit in the first three rows adjacent to the jury box" but otherwise denied the defendant's request to limit the number of law enforcement officers attending as spectators].)  The location and conduct of the uniformed officers and the court's attentiveness and proactive efforts further cut against any conclusion that the jury must have been improperly influenced by the officers' presence.

Also leaning against a finding of inherent prejudice are defense counsel's arguments and the court's instructions. Counsel warned the jurors about the "public pressure" that they may feel because of the presence of police officers in the courtroom.  Furthermore, the jury was expressly instructed to decide the case "based only on the evidence that has been presented" and to ignore any "bias, sympathy, prejudice, or public opinion."   To the extent that jurors may have subconsciously felt any such pressure, counsel's admonition to resist being "influenced" and the court's instruction to ignore "bias" — even if not sufficient on their own to ensure a fair trial — can only have had a salutary effect, helping jurors to

recognize and combat any subconscious pressure. Defendant has offered us no basis to think the presumption that jurors followed the court's instruction was overcome in this case. (Accord, e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 447 ["As we have consistently stated in numerous contexts we generally presume that jurors are capable of following, and do follow, the trial court's instructions"].)

Finally, as in *Flynn*, there was a wide range of reasonable inferences that the jury could have drawn from the officers' presence. (See *Flynn*, *supra*, 475 U.S. at p. 569.) Instead of inferring that the officers came to the courtroom to influence the verdict, the jury reasonably could have attributed their presence to a number of more benign reasons, e.g., to support the victim's family, as any friends of the deceased may have done; to show camaraderie for one another, as members of any organization with which the deceased was affiliated may have wished to do; or to watch "an impressive drama" that is legal proceedings in a capital case, as any curious persons may have done. (*Ibid.*)[7] True, jurors may be affected by the presence of uniformed police officers regardless of what they believe the officers' intentions to be. (See *id.* at p. 570.) But on the basis of "our own experience and common sense," we cannot say that the risk of undue influence here was unacceptably high. (*Id.* at p. 571, fn. 4.)

---

[7] Of course, these benign inferences would be all the more easily drawn if the officers were out of uniform. The fact we find no error in this case should not dissuade trial courts, upon a motion and in appropriate circumstances, from ordering that police officers observing trials do so in civilian garb.

In light of these circumstances, we are not persuaded that the degree of any prejudice defendant suffered by virtue of the presence of uniformed police officers rose to a level of fundamental unfairness. Because defendant does not contend that there was actual prejudice, we conclude that defendant has not shown that he was denied a fair trial. (See *Flynn*, *supra*, 475 U.S. at p. 572; *Woodruff*, *supra*, 5 Cal.5th at p. 757.)

Defendant's attempted reliance on out-of-state authorities is not persuasive. He points us to two cases, *Shootes v. State* (Fla.Dist.Ct.App. 2009) 20 So.3d 434 (*Shootes*) and *Woods*, *supra*, 923 F.2d 1454, in which the appellate courts reversed the defendants' convictions upon a finding that the presence of uniformed officers rendered the trial unfair. Both cases are distinguishable from the matter at hand.

In *Shootes*, there were at least 25 and as many as 70 officers in the courtroom; at least half of the audience was comprised of such officers; and "the officers sat together in the front rows of the gallery, closest to the jury." (*Shootes*, *supra*, 20 So.3d at p. 436.) Moreover, "unlike cases where clothing or accessories worn by spectators might merely have shown support for the victim or another party in general, in [*Shootes*] the officers' apparel was actually a feature of the trial, directly related to [the defendant's] theory of self-defense." (*Id.* at pp. 439–440 [discussing the defendant's claim that he could not recognize officers wearing official apparel as police officers until after he fired upon them and concluding that within such a context, "the display of various formal and informal . . . uniforms [worn by the spectators] could easily have been seen by the jury as a live demonstration of the appearance of the officers involved in the altercation with [the defendant]"].) No such circumstances are present in this case.

*Woods* is similarly far afield. The defendant in that case was charged with murdering a correctional officer. His trial was held in "a small rural county" with a population of just over ten thousand people, one-third of whom were prisoners. (*Woods*, *supra*, 923 F.2d at p. 1457.) The local economy was dominated by prisons, and several jurors either worked in the prisons or had relatives working in the prisons. (See *id.* at pp. 1457–1458.) Adding to the charged atmosphere, the murder victim had given an interview shortly before his death in which he said that the correctional institution was "dangerously understaffed," and "he feared for his safety as a prison guard." (*Id.* at p. 1458.) His death then "became a focal point for the lobbying efforts . . . for the government to hire more correctional officers." (*Ibid.*)

There is little similarity between *Woods* and the present case. As the Attorney General correctly notes, defendant was tried in Alameda County, "not a 'small rural county.'" Furthermore, "no unusual economic circumstances related to law enforcement appear in the record"; and "the record shows no . . . political activity centered on Niemi's death." In contrast to *Woods*, a case in which the jurors may have personally known the officers in attendance, expected to continue being in contact with them, or were disposed to be especially sympathetic to peace officers, there was little possibility of such familiarity or solidarity here. The result in *Woods* must be read in the context of its facts. (See *Brown v. State* (2000) 132 Md.App. 250, 269–270 [cabining *Woods* to its facts]; *Howard*, *supra*, 941 S.W.2d at p. 118, fn. 15 [similar].) Those facts find no counterpart in this matter.

In sum, although we acknowledge the risk of undue influence when a large number of uniformed police officers occupies the gallery, under the particular circumstances of this

case we find that the trial court did not abuse its discretion in denying defendant's motion to limit the number of uniformed officers in the courtroom.

### 4. *Asserted cumulative effect of alleged errors*

Defendant contends that reversal of his convictions is required because of the cumulative effects of asserted errors occurring during the guilt phase. "Because we have found no error, there is no cumulative prejudice to evaluate." (*People v. Lopez* (2018) 5 Cal.5th 339, 371.)

### B. Penalty Phase Issues

### 1. *Victim impact evidence*

### a. *Background*

At the penalty phase, the prosecution sought to introduce as victim impact evidence the testimony of Niemi's family members and three of his fellow police officers. The defense filed a motion to exclude any testimony from the officers, arguing that the testimony would be prejudicial and that, as a categorical matter, victim impact statements should be restricted to family members. In response, the prosecution made an offer of proof regarding the officers' anticipated testimony. After listening to the proffer, the court ruled that it would permit the officers to testify. As the court explained, "the occupation of the victim is so much a part of this trial," and the testimony by Niemi's colleagues would show "not only what kind of person he was, but what kind of cop he was."

Niemi's colleagues testified generally in accordance with the prosecution's offer of proof. In particular, Curt Bar, a San Leandro police officer, related that he and Niemi went through police training together and became "very close friends." Bar learned that he and Niemi had many things in common,

including their "policing styles." According to Bar, Niemi had a "very comforting demeanor" when interacting with members of the public "who had just had a traumatic experience" and was not "disrespectful" while "dealing with people who committed crimes."

Bar further testified that he and Niemi grew close outside of work. When Bar got married, Niemi was his best man. The two men and their families knew each other well, so much so that Bar's children still talked about Niemi after he died.

On the night Niemi was murdered, Bar was notified and went to the hospital where Niemi had been transported. After other people left, Bar stood "over my friend" and "prayed over him." Bar continued to think of Niemi "a great deal." He testified that he could "count on my hand the good friends I've had in my life" and "Niemi was a very, very good friend of mine."

Mario Marez next testified that he was formerly an officer for the San Leandro Police Department and that he had met Niemi before Niemi became a police officer. He related that Niemi had expressed much interest in Marez's police work, and, as the two became friends, Marez "realized [Niemi] would make a great officer."[8] Marez subsequently encouraged Niemi to join law enforcement. He also helped to allay Niemi's wife's concerns "about the dangers of being a police officer," telling her that San Leandro was a relatively safe place.

---

[8] Niemi's mother testified that her son had wanted to become a police officer since he was 19 but was dissuaded by his parents. His wife likewise discouraged him from joining the force because she thought "it was dangerous." However, she eventually changed her mind, and Niemi became a police officer at a later age than most.

When Niemi was killed, Marez drove to the crime scene "faster than [he] ever did in [his] entire police career." He saw Niemi and "knew he was gone." After Niemi's death, Marez resigned from the San Leandro Police Department because he "could no longer serve the public [in] the way I should . . . , and the way Dan would want me to." Marez still thought about Niemi "every day," and felt guilt and regret "for encouraging [Niemi] to join the police department."

After Marez's testimony and outside of the presence of the jury, defense counsel put on the record the witness's demeanor while on the stand. According to counsel, Marez "had collapsed, basically, was just crying up there." As Marez left the stand, he and the next witness, Deborah Trujillo, "exchanged hugs and were crying." Counsel requested an admonition. The court agreed and told the gallery that "everyone who may be witnesses, or are involved in the case, [is asked] to refrain from engaging in any kind of conduct which might potentially affect jurors, and that includes physical contact between witnesses, like hugs."

Trujillo was then called as a witness. She testified that she and Niemi started at the San Leandro Police Department together. The two became "quick friends." Trujillo got to know Niemi's family, and Niemi helped Trujillo through a failed relationship. As one of four women police officers in San Leandro, Trujillo experienced certain challenges; Niemi helped her to deal with them, to "move forward, and not get hung up by some of the challenges I had to face." Trujillo explained Niemi's thinking about his colleagues, stating that "for Dan, if you were a police officer . . . you weren't the guy that came from here, or the female that you weren't sure could make it. . . . [Instead], you were a cop, and he treated everyone like that."

Trujillo was on patrol when Niemi was killed. She drove to the scene, saw Niemi "laying there," and "knew that he was dead." Trujillo insisted that she would be one of the officers to talk to Dionne Niemi, Niemi's wife. Trujillo then proceeded with Marez and another officer to break the news of Niemi's death to Dionne and Niemi's parents. Trujillo continued to maintain contact with the Niemis, stating that she was "lucky to call Dan my friend, and even more honored that I could continue to tell stories to his children." Niemi's death had a lasting impact on Trujillo's life. "Every day," she lived with the fact that she did not get to Niemi "fast enough."

In addition to the live witness testimony, the prosecution also introduced a short story written by Niemi. The defense had objected, and the court held a hearing on the matter. The prosecutor submitted that he would like to enter into evidence two pieces of writing by Niemi, one of which was a longer story titled, Cold Phrase, and the other an untitled shorter work. The prosecutor explained that the stories "show the kind of person [Niemi] was, [and] that directly affects the impact that his death would have on his friends and relatives." The defense, on the other hand, expressed the concern that the stories would "sidetrack [jurors] from the true issue at hand."

After hearing the parties' arguments, the court allowed the prosecution to introduce only the untitled shorter story. The court reasoned that "it would be cumulative to admit both." With regard the content of the writings, the court thought the longer story — which was about "two burning children . . . in a house on fire" — was too emotional and went "beyond the simple purpose for which [it] is being offered." The court did not express the same reservations regarding the shorter story, which concerned Niemi finding an abandoned, recently dead newborn

in a garbage can. Nonetheless, the court stipulated that it would not allow the story to be read to the jury "by a witness who had an emotional connection with Officer Niemi" out of the concern that such a reading "may invoke an emotional response that would be inappropriate."

Dionne Niemi authenticated the story as having been authored by her husband. She also contextualized the writing, explaining that Niemi "was a prolific writer" and that "sometimes if he had a particularly hard call or something that touched him he would write about it." The prosecution then offered the story as an exhibit. In his closing statement, the prosecutor referred to the exhibit, urging the jury to take it "into the jury room and read it" "in order to learn a little bit more about what a man Dan Niemi was."[9]

---

[9]     In its entirety, the story reads:

"Every day people touch our lives. Sometimes they have a profound effect on us and sometimes the effect is so small we never notice the change. Most of the time, however, it lies somewhere in between. This is one of those times, in between.

"When I first met the baby boy he was only about a day old. His little hand, so small it would probably not grasp completely around my thumb, was curled into a tiny fist held tightly against his cheek. His legs were tucked into his chest and the hair on his head, so black and full, was still wet. Lying on his side, his head was cocked back and I couldn't see his tiny face because it was pressed so hard against the inside of the garbage can where we found him. The plastic bag which served as his last bed was pulled away and under the harsh light of my flashlight I could see his skin was no longer the

healthy pink of a newborn child; instead it was a medium shade of gray as one might see on a pair of gym sweats or one of those old metal folding chairs. I stood there, waiting for a feeling, any feeling, but none came. To my surprise and relief I felt nothing save a dull anger, a muted frustration. My partner said it best; he had been at the scene of a fatal accident just the night before and stood by helplessly as a woman died. We spoke later and he said, 'We have a job to do and this is part of it. We move on.' And that was what I did. I moved on, did my job, and left the feelings alone for a while.

"It started with a seventeen-year-old girl arriving at the hospital with blood between her legs and a severed umbilical cord still dangling, but no baby. She denied ever being pregnant. We were sent to her house for the obvious reason: to find the infant. On the way in we passed the two garbage cans set out on the curb for the morning's pickup. I saw them and, in hindsight, I think I already knew where to look. But that's not how it was done and we started inside. I found the clothes hidden under her bed, soaked in blood and wrapped in a plastic bag not unlike the one holding the infant and tossed in amongst the rotting food and old newspapers. We found the bloodstained mattress where she had probably brought the little boy into the world. We found the bloody toilet bowl brush that had been used to clean the mess in the bathroom.

"And then we found the baby. I will probably never forget the feeling as I was looking in a bedroom closet and I heard over the radio, 'Have the ambulance respond now.' That was all. Just a simple call for the ambulance waiting down the street. Like a switch turned off, I stopped my search, shut the door, turned and walked outside knowing the hard part was over.

### b. *Analysis*

Defendant challenges the admission of certain victim impact evidence — specifically, the police officers' testimony and the short story. As the United States Supreme Court has instructed, "[v]ictim impact evidence is simply another form or

---

"I've often heard my friends complain about their newborn baby's crying into the night. I've always told them enjoy it now, because having a daughter of my own, I see how fast they grow and soon those tiny cries are replaced with words like 'Mommy' and 'Daddy' and 'I don't want to go to bed now!' I try to tell my friends, enjoy those cries because when they stop it means your child is growing up.

"Now I've seen the other side of that dark coin. I've seen what it's like when those cries stop only to be replaced by the silence and the stillness. He had been born alive, wrapped in a plastic bag and put out with the trash. In the cold, harsh light of my flashlight, I saw the silence.

"We walk into the mess and the mire, we do our job as best we know, and then we walk out again. But we never leave without taking a little bit with us; it's called learning. We take a little piece of every situation with us that help us deal with the next time we are called on to walk back into the mess and the mire.

"From this one I will take a little bit to carry with me so that when I see my little girl I make sure to give her an extra hug, or let her stay up just a minute longer. I will use it as a reminder to make sure and wave back when the children wave at me. I will use it to appreciate the life I have.

"I only fear that this time I may have left a little bit of me back there, in that mess and that mire."

method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." (*Payne v. Tennessee* (1991) 501 U.S. 808, 825 (*Payne*).)  Under the court's jurisprudence, "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." (*Ibid.*)  As such, "[t]he federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair." (*People v. Brady* (2010) 50 Cal.4th 547, 574 (*Brady*).)  The same is true under California law: "Unless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim and the community is relevant and admissible under section 190.3, factor (a) as a circumstance of the crime." (*Ibid.*)

### i. *Testimony of fellow police officers*

Consistent with his trial argument, defendant contends that Niemi's fellow officers should not have been allowed to testify because, under his reading of *Payne*, coworkers are not authorized to give victim impact evidence.  Defendant acknowledges that we have "repeatedly rejected" such a claim. We have.  (See, e.g., *Brady*, *supra*, 50 Cal.4th at p. 578 ["Victim impact evidence, however, is not limited to family members, but may include the effects on the victim's friends, coworkers, and the community — including when the victim's coworkers are law enforcement personnel"]; *People v. Henriquez* (2017) 4 Cal.5th 1, 37–38 [relying on *Brady* to reject the defendant's argument that "the trial court erred by admitting victim impact testimony by 'non-family members' "]; *People v. Taylor* (2010) 48 Cal.4th 574, 646 [rejecting the argument that "admitting victim impact

testimony from a witness who was neither a family member nor a close friend of the victim violated the Eighth Amendment"]; *People v. Ervine* (2009) 47 Cal.4th 745, 792–793 [similar, collecting cases]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1183 ["Defendant argues that only family members can give victim impact testimony. [¶] Defendant is mistaken"]; *People v. Marks* (2003) 31 Cal.4th 197, 235 (*Marks*) ["Defendant contends the evidence should have been excluded because [the witness] was not a relative of [the victim]. The United States Supreme Court has not restricted the admissibility of victim impact evidence to relatives, however"]; accord, e.g., *People v. Scott* (2011) 52 Cal.4th 452, 495 ["Victim impact evidence is commonly provided by several family members, colleagues, or friends"].)

Defendant urges us to reconsider our precedent.[10] He has offered no persuasive reason to do so. Indeed, defendant's reading of *Payne* finds little support in the case itself. It is true that the victim impact evidence at issue in *Payne* consisted of the testimony of a murder victim's mother, who said that her grandson cried for his mother and sister, both of whom were killed by the defendant. (*Payne, supra*, 501 U.S. at pp. 814–815.) As we have noted, however, "[t]he *Payne* court . . . did not restrict its holding to the circumstances there presented." (*People v. Hartsch* (2010) 49 Cal.4th 472, 508 (*Hartsch*).) Instead, the court "stated its holding in broad terms" (*id.* at p. 509), decreeing that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the

---

[10] Alternatively, he "presents this claim for purposes of exhausting his state court remedies."

defendant." (*Payne*, *supra*, 501 U.S. at p. 825.) The court also explained its holding in reference to non-family members, maintaining that " '[t]he State has a legitimate interest in . . . reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Ibid.*; see also *id.* at p. 830 (conc. opn. of O'Connor, J.) ["A State may decide that the jury, before determining whether a convicted murderer should receive the death penalty, should know the full extent of the harm caused by the crime, including its impact on the victim's family and community"]; *Marks*, *supra*, 31 Cal.4th at pp. 235–236 [noting that "the separate opinions in *Payne* recognized the broad scope of victim impact evidence"].)

At core, the holding in *Payne* rests on the premise that victim impact evidence is permissible because the evidence is "designed to show . . . *each* victim's 'uniqueness as an individual human being' " and, in so doing, demonstrate "the specific harm caused by the crime in question." (*Payne*, *supra*, 501 U.S. at pp. 823, 825.) Given this rationale, it is difficult to discern why, under *Payne*, a victim's " 'uniqueness as an individual human being' " may be attested to only by family members, and not — as here — by a victim's colleagues and close friends. (*Id.* at p. 823.)

Of course, *Payne* does not prohibit a state from imposing more stringent limits on the use of victim impact evidence than the federal Constitution requires. (See *Payne*, *supra*, 501 U.S. at p. 827 ["We thus hold that *if* the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar" (first italics added)]; *id.* at p. 831 (conc. opn. of O'Connor,

J.) ["We do not hold today that victim impact evidence must be admitted, or even that it should be admitted"].) But the mere fact that some states' legislatures have adopted such limitations has little bearing on whether we, the courts, should do so when our Legislature has not. As such, defendant's citations to out-of-state authorities interpreting out-of-state statutes (see, e.g., *State v. Muhammad* (N.J. 1996) 678 A.2d 164; *Lott v. State* (Okla.Crim.App. 2004) 98 P.3d 318) do not persuade us to reconsider our precedent regarding the proper limits of victim impact statement under *Payne* and section 190.3, factor (a).

Defendant also asserts that the officers' testimony should have been excluded under Evidence Code section 352 on the ground that the testimony was unduly prejudicial. (See *ibid.* ["The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice"].) As explained below, we find that the trial court did not abuse its discretion in allowing Bar, Marez, and Trujillo to testify.

The trial court in this case "carefully considered whether the proposed testimony fell within appropriate limits." (*People v. Dykes* (2009) 46 Cal.4th 731, 782 (*Dykes*).) When the defense challenged the prosecution's anticipated use of the officers' testimony, the court had the prosecutor make an offer of proof. The court then noted that the evidence offered by Niemi's fellow police officers was highly probative. We agree. Defendant was charged with murdering a peace officer, and both of the special circumstances that rendered him eligible for the death penalty — that he killed Niemi to avoid arrest, and that he killed Niemi knowing that Niemi was a peace officer engaging in the performance of his duties — related to the nature of Niemi's

work. Because "the occupation of the victim is so much a part of this trial," the testimony by Niemi's colleagues had significant probative value as it showed "not only what kind of person he was, but what kind of cop he was." (Accord, *Marks, supra,* 31 Cal.4th at pp. 210–211 [admitting the testimony of the victim's employee when the victim was killed at work].)

Consistent with the trial court's expectation that the officers would provide the jury with a glimpse of Niemi as a police officer, Bar testified regarding Niemi's "policing style[]." Marez recounted that he had thought that Niemi "would make a great officer," and that he encouraged Niemi to join his own police department. Trujillo explained how Niemi viewed his colleagues, stating that for Niemi, it did not matter if an officer was a person who "came from here" or a woman who might not have proved her capabilities; instead, what mattered to Niemi was that "you were a cop."

To be sure, the officers also recounted the more personal aspects of their relationship with Niemi. Their collective statement, however, "was not unduly emotional or inflammatory, and it was relatively brief." (*People v. Virgil* (2011) 51 Cal.4th 1210, 1275.) As to length, the three officers' transcribed testimony totaled 22 pages of the reporter's transcript. By way of comparison, Officer Geser — who testified regarding defendant's threat of violence under section 190.3, factor (b) — alone gave 10 pages of testimony, and Niemi's family members gave testimony totaling 32 pages. Concerning substance, the officers gave "traditional victim impact evidence," "extoll[ing] Officer [Niemi's] virtues and demonstrat[ing] they missed him." (*Brady, supra,* 50 Cal.4th at p. 577.) "As in other cases, the witnesses here described the 'immediate effects' of the murders, as well as their 'residual and

lasting impact.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 298 (*Verdugo*).) Under similar circumstances, we have concluded that "[n]either the type nor the amount of evidence warrants reversal." (*Brady*, *supra*, 50 Cal.4th at p. 577.)

This is not to say that the testimony was lacking in emotive content. "Victim impact evidence is emotionally moving by its very nature," however, and "that fact alone does not make it improper." (*Verdugo*, *supra*, 50 Cal.4th at p. 299; see also, e.g., *People v. Booker* (2011) 51 Cal.4th 141, 193.) Niemi's colleagues testified about feeling guilt and regret over his death, and Marez testified that he resigned from the police force because of Niemi's death. Although "emotionally moving," such statements are within the permissible scope of victim impact evidence. (*Verdugo*, *supra*, 50 Cal.4th at p. 299; see *People v. Ervine* (2009) 47 Cal.4th 745, 793 ["Nor are victim impact witnesses limited to expressions of grief, for our case law permits a showing of 'the specific harm caused by the defendant' [citation], which encompasses the spectrum of human responses, including anger and aggressiveness [citation], fear [citation], and an inability to work"]; *People v. Blacksher* (2011) 52 Cal.4th 769, 841.) Likewise, the fact that Marez cried on the stand "does not render that testimony inflammatory." (*Verdugo*, *supra*, 50 Cal.4th at p. 298.) Marez and Trujillo also hugged, but that contact — followed promptly by the trial court's admonishment for witnesses to refrain from such behavior — did not turn the admission of their otherwise appropriate testimony into an abuse of discretion.

### ii. *Admission of short story*

Defendant also argues the short story should have been excluded under Evidence Code section 352. Based on an

analysis similar to that conducted above, we find no merit in defendant's claim.

The trial court "carefully considered" the story, taking into account both its length and subject matter. (*Dykes, supra,* 46 Cal.4th at p. 782.) The court exercised its discretion in choosing to admit the short story but to exclude a longer story that it determined to be too emotional. The court further limited the risk of undue prejudice by not allowing a person close to Niemi to read the story, thus avoiding "an emotional response that would be inappropriate."

Regarding the writing itself, we acknowledge the moving nature of the essay. At the same time, we recognize the extent to which the story is probative of Niemi's character, showing him as a police officer, a father to a young daughter, and a person touched by the tragic incident described therein. In short, the story was relevant to show Niemi's " 'uniqueness as an individual human being.' " (*Payne, supra,* 501 U.S. at p. 823.)

Nor can we say that the story was cumulative of the live witnesses' testimony; it was through the story only that the jury heard directly from the victim himself, contrasted with hearing *about* him. Ultimately, defendant has provided no cogent ground to distinguish this story from other creative works that we found admissible in the past. (See *People v. Mendez* (2019) 7 Cal.5th 680, 713–714 [finding no error when the victim's mother read to the jury a poem her daughter had written "bemoan[ing] gang violence" before the daughter was killed in a gang-related shooting]; *Verdugo, supra,* 50 Cal.4th at p. 299 [finding no error in the trial court's decision to play for the jury songs that the victim had recorded and given to her father because the songs "simply illustrated the gift [a witness] had

described in her testimony" and positing that "[h]ad [the victim] instead created a collage of photographs of Mexico for her father, taken by individuals unrelated to the family, the trial court would have likewise acted properly in allowing the jury to view it"].) Given the wide discretion afforded to trial courts regarding the admissibility of such evidence, we cannot say that the court here erred in allowing the short story to be admitted into evidence.

Against this backdrop, defendant offers only speculation. For instance, he contends that because the story involved the "repugnant" death of a baby, "[t]he risk was high that the outraged emotion of the story would spill over, and the jury would judge [defendant] based on a distressing incident that had nothing to do with him." The record is bereft of any circumstantial evidence indicating that the jury might have used the story in this prejudicial manner. As the Attorney General convincingly urges, the prosecution's argument tended to dispel the likelihood that the jury may have misdirected toward defendant any outrage it might have felt concerning the infant's death. "The prosecutor directed the jury's attention to the short story in the context of arguing that Niemi 'was a unique individual.' [Citation.] The prosecutor did not review the story's description of finding the dead infant, nor did he connect the story to [defendant]. Instead, he recited the last part of the story . . . and urged the jury to read the full story 'to learn more about what a unique individual' Niemi was 'from Dan Niemi himself.' " In other words, the prosecution urged the jury to use the story for its proper purpose. Finally, the length of the jury's deliberations — four days — "rather strongly implies that, rather than rushing to judgment under the influence of unbridled passion, the jurors arrived at their death

verdict only after a full and careful review of the relevant evidence and of the legitimate arguments for and against the death penalty." (*People v. Jurado* (2006) 38 Cal.4th 72, 134.)[11]

In sum, we find no error in the trial court's admission of the victim impact evidence challenged here.

### 2. *Instruction on lingering doubt*

#### a. *Background*

Prior to the commencement of the penalty phase, defense counsel submitted a proposed special instruction on lingering doubt, which read, in pertinent part, "In determining mitigating factors, the jurors may also consider any lingering doubt they may have concerning their verdict in the guilt phase." The prosecution opposed the motion, asserting that it was unnecessary. The trial court agreed. The court nonetheless made it clear that the defense could argue lingering doubt to the jury directly.

In its charge to the jury, the court instructed on the various aggravating and mitigating circumstances enumerated

---

[11] Of course, the length of deliberations may also indicate that "the question of penalty [was] a close and difficult one." Yet, although potentially relevant in prejudice analysis, the closeness of the penalty determination does not render the admission of victim impact evidence an error. (See, e.g., *Dykes, supra,* 46 Cal.4th at p. 786 ["We have not restricted victim-impact evidence to cases in which it would have little effect upon the verdict. . . . The relevance of the evidence does not depend upon the strength or weakness of the prosecution's case in aggravation. Although this type of evidence should not be admitted if it is inflammatory, as long as it is otherwise admissible, it properly may form a basis — along with the prosecutor's related argument — for the jury's decision in favor of the death penalty"].)

in section 190.3. In particular, the court instructed the jury regarding factors (a) and (k). Jurors were thus told that in determining whether defendant should receive life or death, they should consider "[t]he circumstances of the crime" (see § 190.3, factor (a)), as well as "[a]ny other circumstance, whether related to these charges or not, that lessens the gravity of the crime even though the circumstance is not a legal excuse or justification" (see § 190.3, factor (k)) — and they were told that "any other circumstance" included "sympathy or compassion for a defendant or anything you consider to be a mitigating factor, regardless of whether it is one of the factors listed [in section 190.3]."

The defense followed up on the instructions by urging the jury to consider lingering doubt as a mitigating factor. As counsel stated in closing argument, "if any of you still have perhaps not a reasonable doubt but some residual, minor, lingering doubt about [defendant's] state of intoxication," then "that's a mitigating factor for you to look at in order to support a verdict of life in prison."

### b. Analysis

Defendant contends that the trial court was obligated to specifically instruct the jury that it may consider lingering doubt in its penalty determination. Not so. (E.g., *People v. Rivera* (2019) 7 Cal.5th 306, 346 [" 'Although the jurors may consider lingering doubt in reaching a penalty determination, there is no requirement under state or federal law that the court specifically instruct that they may do so' "]; *People v. Anderson* (2018) 5 Cal.5th 372, 425 ["defendant argues the court should have instructed on lingering doubt. It did not have to do so"]; *People v. Boyce* (2014) 59 Cal.4th 672, 708 (*Boyce*); *People v.*

*Jackson* (2014) 58 Cal.4th 724, 769–770 (*Jackson*); *People v. Edwards* (2013) 57 Cal.4th 658, 765; *People v. Thomas* (2012) 53 Cal.4th 771, 826 (*Thomas*); *Hartsch, supra,* 49 Cal.4th at pp. 511–512.)

Moreover, no such instruction is necessary when — as here — the court instructed the jury on section 190.3, factors (a) and (k) and defense counsel urged the jury to consider residual doubt in closing argument. (E.g., *People v. Reed* (2018) 4 Cal.5th 989, 1012–1013; *People v. Brooks* (2017) 3 Cal.5th 1, 104 (*Brooks*); *Boyce, supra,* 59 Cal.4th at pp. 708–709; *Jackson, supra,* 58 Cal.4th at p. 770; *Thomas, supra,* 53 Cal.4th at pp. 826–827; *People v. Edwards, supra,* 57 Cal.4th at p. 765; *Hartsch, supra,* 49 Cal.4th at p. 513; *People v. Hines* (1997) 15 Cal.4th 997, 1068; *People v. Sanchez* (1995) 12 Cal.4th 1, 77–78.)

Defendant asks us to reconsider our settled precedent on these points. He has offered us no persuasive reason to do so.

### 3. *Responses to jury questions*

During deliberations, the jury sent the court a number of questions. Defendant now challenges the court's answers to four of those questions.

### a. *Circumstances of the crime*

The first challenge concerns the court's response to an inquiry about the circumstances of the crime. In the same written note, the jury requested both "a definition of 'an element of a crime' as included in the definition of an 'aggravating circumstance' " and "a definition of 'circumstances of the crime' as included in Factor A." Defendant challenges only the court's response to the second question, which he objected to at trial. The response reads, " 'Circumstances of the crime,' means the manner in which the crime was committed and the events

immediately surrounding its commission, as well as those leading up to and following the commission of the crime. This includes the harmful impact of the crime on the victim's family and friends."

Defendant contends that the court's answer was error. In particular, he argues that the answer was "incomplete" and "necessarily favored the prosecution" because it "singl[ed] out an aggravating aspect of the circumstances of the crime" — the impact of the murder on Niemi's family and friends. We disagree.

Under our case law, trial courts are permitted to give special instructions "pinpointing victim impact evidence as a circumstance of the crime within the meaning of section 190.3, factor (a)." (*People v. Souza* (2012) 54 Cal.4th 90, 138.) For instance, we found no error regarding an instruction stating, " 'As part of the circumstances of the offense under factor A, you may also consider the testimony offered in this penalty phase portion of the trial concerning the impact of the crimes on the family and friends of the victims.' " (*Ibid.*, italics omitted; see also *People v. Harris* (2005) 37 Cal.4th 310, 358 [expressing no disapproval of the instruction, " '[if] supported by the evidence, it is proper to consider the impact of the murder on the victim's family (including their pain and suffering) when determining the appropriate penalty. You are further instructed that such evidence is to be included within the meaning of factor (a), the circumstances of the offenses, in the preceding instruction (CALJIC No. 8.85) and is not a separate factor in aggravation' "].)

In the context of this case, we do not find that the trial court's reference to "the harmful impact of the crime on the

victim's family and friends" was improper. To be sure, the court's response defining the "circumstances of the crime" may have been stated in more neutral terms. Contrary to defendant's assertion, however, the court did not suggest that all circumstances of the crime were aggravating. Although the court told jurors that the circumstances of the crime "include[] the harmful impact of the crime on the victim's family and friends" — an aggravating factor — it also said that the circumstances of the crime "means the manner in which the crime was committed and the events immediately surrounding its commission, as well as those leading up to and following the commission of the crime." The response thus conveyed that the "circumstances of the crime" were not limited to the aggravating circumstance of "the harmful impact of the crime on the victim's family and friends." More broadly, the court did not equate the circumstances of the crime with aggravating circumstances.

The court also explained its rationale for mentioning the effect of the crime on Niemi's family and friends. The court was concerned that although the instruction defining "aggravating circumstance" made clear that an aggravating circumstance includes "the harmful impact of the crime,"[12] the instruction regarding the various aggravating factors under section 190.3 did not mention such impact. Because the jury had asked both about "aggravating circumstance" and "circumstances of the crime," the court believed that jurors were "specifically

---

[12]    See CALCRIM No. 763 [stating in relevant part that "[a]n *aggravating circumstance* or *factor* is any fact, condition, or event relating to the commission of a crime, above and beyond the elements of the crime itself, that increases the wrongfulness of the defendant's conduct, the enormity of the offense, or the harmful impact of the crime"].

wondering" whether the circumstances of the crime "include victim impact." The court thus intended its answer regarding the "harmful impact . . . on the victim's family and friends" to be responsive to the jury's questions.

The court's other instructions further undermine defendant's contention that its response to the jury's question prejudicially focused on a single aggravating factor. Using CALCRIM No. 763, the court instructed jurors that "[u]nder the law, you must consider, weigh, and be guided by specific factors, some of which may be aggravating *and some of which may be mitigating*." (Italics added.) The court reiterated this directive in another instruction, telling the jurors that in reaching a decision on the appropriate penalty, they "must consider, take into account, and be guided by the mitigating and aggravating circumstances." (CALCRIM No. 766.) Furthermore, each juror was "free to assign whatever moral or sympathetic value you find appropriate to each individual factor and to all of them together." (*Ibid.*)

"An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745–746; see also, e.g., *People v. Beardslee* (1991) 53 Cal.3d 68, 97 [a court has discretion "to determine what additional explanations are sufficient to satisfy the jury's request for information"].) In light of the deferential standard of review and the complete answers the court gave, we conclude the court did not abuse its discretion here.

### b. *Quality of the arguments of counsel*

The jury next sent a question that reads, "From section 766 (weighing process) can the quality of 'the arguments of counsel' be considered as a mitigating circumstance?" Defense counsel argued that the answer should be yes because section 190.3 "factor (k) allows basically anything to be considered in mitigation." The court rejected the argument as misdirected. The court ultimately answered the jury's question as follows: "In reaching your decision, you must consider and weigh the aggravating and mitigating circumstance or factors shown by the evidence. [¶] Statements of counsel are not evidence. [¶] The answer is: no." (See also CALCRIM No. 763 ["In reaching your decision, you must consider and weigh the aggravating and mitigating circumstances or factors shown by the evidence"]; CALCRIM No. 104 ["'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I tell you to consider as evidence. . . . [¶] Nothing that the attorneys say is evidence."].)

Defendant appears to reprise the argument raised at trial, interpreting the question as if the jury had asked whether it may consider the arguments of counsel in determining penalty. Yet, even if we treat the jury's inquiry as having concerned the content or substance of the arguments, still the court's response was unobjectionable. The court did not say that the jury could not consider counsel's arguments. Indeed, the court had earlier instructed the jurors that they "must consider the arguments of counsel and all the evidence presented during both phases of the trial." Counsel's arguments thus were not irrelevant to the jury's penalty deliberations. But there is a difference between "consider[ing] the arguments of counsel" and treating those arguments as substantive evidence or viewing them as

mitigating factors. If, as trial counsel posited, something that counsel said led the jury "to feel some sympathy, or mercy for [defendant]," then it is the sympathy or mercy that is mitigative — not counsel's skill in evoking those sentiments. The court instructed the jury accordingly. The court, in its general charge, told jurors they may "consider sympathy or compassion for a defendant." As the court's subsequent response made clear, however, statements of counsel are not evidence; nor are they themselves mitigating factors; and "the quality of 'the arguments of counsel'" cannot be considered as a mitigating circumstance.

Defendant's remaining arguments on this issue are somewhat elusive. On the one hand, defendant appears to concede that the trial court was correct "in telling the jury that arguments are not evidence and cannot be considered as a mitigating circumstance." On the other hand, he argues that the trial court was obligated to supplement its response by informing jurors that "although counsel argument is not a mitigating circumstance or factor in and of itself, the jury must consider counsel's argument[] and [its] persuasiveness, in other words, the quality of counsel's argument[], in determining which circumstances or factors were mitigating (or aggravating), the relative weight to assign them in light of the evidence, and the appropriate penalty."

We do not find that the jury's question necessitated this response. The jury did not intimate — much less say — that what it wanted to know was (as defendant puts it) whether it must "consider counsel's arguments and their persuasiveness . . . in determining which circumstances or factors were mitigating (or aggravating), the relative weight to assign them in light of the evidence, and the appropriate penalty." The jury

71

simply asked whether it may consider the quality of counsel's arguments as a mitigating circumstance, and the court directly answered that question.

Finally, by not offering this more fulsome proposed response at trial, defendant has forfeited the claim. (See *Dykes*, *supra*, 46 Cal.4th at p. 802 ["When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal"].)

### c. *"Maturely and meaningfully reflected"*

The jury subsequently asked, "From the definition of first degree murder, what does 'maturely and meaningfully reflected upon the gravity of his act' mean? [¶] What is the definition of 'maturely,' in the above? What is the definition of 'meaningfully,' in the above?" After an off-the-record conversation with counsel, the court answered the jury's question as follows: "As I instructed you on Monday, you must disregard all of the instructions I gave you in the earlier phase of the trial, and follow only the new instructions given in this phase of trial. [¶] The new instructions do not include the instruction regarding 'mature and meaningful reflection.' "

The court thereafter had an on-the-record discussion with the parties regarding its answer. The court asked defense counsel if counsel had "a position" on the answer it sent to the jury. Counsel indicated she "concurred" with the court's reply.

Defendant now contends that by giving the jury the answer it did, the court led the jury to believe that it could not

consider whether defendant maturely and meaningfully deliberated on the gravity of his act in determining the appropriate penalty. Specifically, defendant now claims that the court's answer precluded the jury from considering defendant's " 'culpable mental state' " under section 190.3, factor (a); his intoxication under factor (h); his age under factor (i); or any catchall extenuating circumstance under factor (k).

To the extent that the claim was not forfeited by failure to object below (see *Dykes*, *supra*, 46 Cal.4th at p. 802), defendant misreads the jury's question and the court's answer. The jury did not inquire whether mature and meaningful deliberation regarding the gravity of one's act was relevant to the jury's decision to impose life or death. Nor did the court make any suggestion on that score. Rather, the jury asked for the meaning of "maturely and meaningfully reflected upon the gravity of his act" — a phrase that was not part of the penalty phase instructions. The court declined to give the jury the definitions it requested, instead reminding jurors that the instructions did not include this language.[13] Defendant does not claim that the penalty phase instructions were incomplete, and the court did not abuse its discretion in answering the jury's question as it did. (Accord, *Dykes*, *supra*, 46 Cal.4th at p. 802 ["The court is under a general obligation to 'clear up any instructional confusion expressed by the jury,' but '[w]here . . . the original

---

[13]    If anything, the directive to disregard the guilt phase instructions benefitted defendant because the particular instruction at issue informed the jury that mature and meaningful reflection was irrelevant to premeditation and deliberation. (See § 189, subd. (d).) Omitting that instruction at the penalty phase arguably broadened the scope of relevant mitigating circumstances.

instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information' "].)

Defendant further argues that because the court had "inserted the concept [of mature and meaningful reflection upon the gravity of one's act] into the guilt phase," it had a duty to define the meaning of that phrase "when the jury re-raised the issue at penalty." We fail to see the connection.

A "trial court bears the responsibility of instructing the jury on all the general principles of law raised by the evidence which are necessary for the jury's proper understanding of the case." (*People v. Murtishaw* (1989) 48 Cal.3d 1001, 1022 (*Murtishaw*).) Yet the court's instruction at the guilt phase did not render the concept of mature and meaningful reflection any more "necessary for the jury's proper understanding of the case" at the penalty phase. (*Ibid.*) As the Attorney General points out, at the penalty phase, the jury was not required to determine whether defendant's conduct and the surrounding circumstances "evinced mature and meaningful reflection." Rather, the jury was required to "consider and weigh the aggravating and mitigating circumstances or factors shown by the evidence" and to determine if "the aggravating circumstances both outweigh the mitigating circumstances and are so substantial in comparison to the mitigating circumstances that a sentence of death is appropriate and justified." To the extent defendant's mature and meaningful reflection on the gravity of his act (or the lack thereof) was relevant to the jury's "proper understanding of the case," it is only because such reflection may have some bearing on the aggravating and mitigating factors. (*Murtishaw*, *supra*, 48 Cal.3d at p. 1022.) Because the jury was properly instructed

on those factors, however, the court was not required to define "mature" and "meaningful" reflection.

The cases defendant cites do not assist him. In *People v. Miller* (1981) 120 Cal.App.3d 233, 235–236, the defendant was charged with assault by means of force likely to produce great bodily injury, and the jury asked for a definition of "great bodily injury." In *People v. Solis* (2001) 90 Cal.App.4th 1002, 1012–1013, the defendant was charged with making terrorist threats, one of the elements of which was " ' "[t]he threatening statement caused the other person reasonably to be in sustained fear for her own safety," ' " and the jury requested an explanation on the word "sustained." These cases thus "involve situations where the jury's request for clarifying instructions was pertinent to an issue the jury was directly required to decide." (*Murtishaw, supra*, 48 Cal.3d at p. 1024.) As such, they are "inapposite." (*Ibid.*)

Finally, if the jury was inclined to consider whether defendant maturely and meaningfully reflected upon the gravity of his act, it could do so at least under section 190.3, factor (k). As noted, the court instructed the jury with this catchall factor, which permitted jurors to take into account "[a]ny other circumstance which extenuates the gravity of the crime." (§ 190.3, factor (k).) And within its response to the question at hand, the court reminded the jury that it was to follow "the new instructions given in this phase of trial," which included the factor (k) instruction. Insofar as defendant arguably lacked mature and meaningful reflection and the absence of such reflection "extenuates the gravity of the crime," therefore, the jury was free to consider that mitigating circumstance under the court's penalty phase instructions. (*Ibid.*)

### d. *Lack of prior felony convictions*

The last of defendant's challenges regarding the court's answers to jurors concerned three questions that the jury submitted on the same afternoon. The jury first asked, "Did the People and defense stipulate no previous felony convictions?" The court answered, "There is no evidence of prior felony convictions. You must therefore assume there are none." The jury next queried, "Must we dismiss [section 190.3,] factor (c) due to the lack of evidence of other felony convictions?" The court responded, "You may attach whatever significance you find appropriate to the lack of evidence of a prior felony conviction under factor (c)." Lastly, the jury asked, "Must a circumstance to be considered for 'factor k' (763 Factors to Consider) be supported by evidence (222 Evidence)?" The court eventually answered, in writing:

> "Factor (k) includes two categories of things you may consider in making your decision:
>
> > (1) Sympathy or compassion for the defendant; and
> > (2) Anything you consider to be a *mitigating* factor, regardless of whether it is one of the other listed factors.
>
> "I assume your question related to the <u>second</u> of these two categories — mitigating circumstances or factors.
>
> "As I told you at the beginning of Instruction 763, you must consider and weigh the aggravating and mitigating circumstances or factors *shown by the evidence*."

Defendant argues that the court's responses likely misled the jury into believing that it could not consider defendant's lack of prior felony convictions as a mitigating factor. According to

defendant, because the court (1) emphasized in the answer to the third question (regarding factor (k)) that jurors "must consider and weigh the aggravating and mitigating circumstances or factors *shown by the evidence*" while (2) simultaneously informing jurors (regarding factor (c)) that "[t]here is no evidence of prior felony convictions," the court effectively told jurors that they could not consider defendant's "clean record," in light of the fact that there was no affirmative documentation about his lack of convictions. The court compounded the problem, defendant asserts, by refusing trial counsel's proffer that "the lack of felony convictions is a mitigating circumstance," and instead telling the jury that it "may attach whatever significance you find appropriate to the lack of evidence of a prior felony conviction under factor (c)."

We reject defendant's argument, finding no reasonable likelihood that "the jury misunderstood and misapplied the instruction[s]" in the manner suggested. (*Smithey, supra,* 20 Cal.4th at p. 963.) First, the trial court did not merely inform the jurors that "[t]here is no evidence of prior felony convictions."[14] The court instead told the jury the inference it must draw from that dearth of evidence: Jurors "must . . . assume there are no[]" felony convictions. Given the court's instruction, there is little reason to believe that the jury did anything other than take it as given that defendant had no felony convictions. Along the same lines, the court's statement that jurors were free to "attach whatever significance you find appropriate to the lack of evidence of a prior felony conviction under [section 190.3,] factor (c)" undermines the contention that

---

[14]    Defense counsel did not object to this answer.

jurors thought they could not afford any weight to defendant's "clean record" due to the lack of supporting evidence.

Second, both the prosecution and defense addressed defendant's lack of felony convictions — and neither suggested that the jury disregard such a circumstance because of the absence of documentation. (Accord, *Young, supra,* 34 Cal.4th at p. 1202.) The defense, predictably, urged the jury to consider the fact that defendant had "no prior felonies, not one" as "a mitigating factor." But even the prosecutor admitted that section 190.3, factor (c) was a mitigating circumstance in defendant's case, although he sought to minimize the impact of the factor, calling it only "slightly mitigating." According to the prosecutor, the absence of prior felonies in defendant's case was "not a major factor" — not because it has not been proved — but because defendant had not been "an adult for all that long" to accumulate such convictions.

We conclude the trial court's answer was not an abuse of discretion.

### e. Constitutional claims

Finally, defendant argues that the trial court's responses violated the federal Constitution. For the same reasons that we have found no state law error, we perceive no constitutional infirmity with the court's answers. Considered singly or collectively, there was no reasonable probability that, as defendant claims, the court's statements "hindered the jury from considering and giving effect to [defendant's] mitigation," "confer[ed] an unfair advantage on the prosecution," or "denied [defendant] representation by counsel at a critical state of the sentencing trial." (Accord, e.g., *People v. Dalton* (2019) 7 Cal.5th 166, 208 [" ' "[n]o separate constitutional discussion is required,

or provided, when rejection of a claim on the merits necessarily leads to rejection of [the] constitutional theory" ' "].)

### 4. *Constitutionality of California death penalty law*

Defendant raises a series of challenges to the constitutionality of California's death penalty scheme. We have consistently rejected such arguments and continue to do so here because defendant has given us no new reason to revisit our precedents.

"The special circumstances listed in section 190.2 that render a murderer eligible for the death penalty . . . are not so numerous and broadly interpreted that they fail to narrow the class of death-eligible first degree murderers as required by the Eighth and Fourteenth Amendments." (*Brooks*, *supra*, 3 Cal.5th at pp. 114–115.)

"Section 190.3, factor (a), which permits the jury to consider the circumstances of the capital crime in its penalty determination, does not license the jury to impose death in an arbitrary and capricious manner in violation of the United States Constitution." (*People v. Powell* (2018) 5 Cal.5th 921, 963 (*Powell*).)

"The California death penalty scheme is not constitutionally defective because it fails to require jury unanimity on the existence of aggravating factors, or because it fails to require proof beyond a reasonable doubt that death is the appropriate penalty, that aggravating factors exist, or that aggravating factors outweigh mitigating factors. (*People v. Lynch* (2010) 50 Cal.4th 693, 766 [114 Cal.Rptr.3d 63, 237 P.3d 416].) The United States Supreme Court's decisions interpreting the right to a jury trial under the federal Constitution (see *Blakely v. Washington* (2004) 542 U.S. 296

[159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] do not change these conclusions." (*Thomas, supra*, 53 Cal.4th at p. 835, see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1235.)

"No burden of proof is constitutionally required, and the jury need not be instructed that there is no burden of proof." (*Thomas, supra*, 53 Cal.4th at p. 836.)

"The jury's reliance on unadjudicated criminal activity as a factor in aggravation under section 190.3, factor (b), without any requirement that the jury unanimously find that the activity was proved beyond a reasonable doubt, does not deprive a defendant of any federal constitutional rights, including the Sixth Amendment right to trial by jury and the Fourteenth Amendment right to due process." (*Brooks, supra*, 3 Cal.5th at p. 115.)

CALCRIM No. 766's use of the phrase "so substantial," like CALJIC No. 8.88's use of that same phrase, " 'is not impermissibly vague or ambiguous.' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1061 (*Potts*).)

There is no constitutional requirement "to instruct that if the mitigating circumstances outweigh the aggravating circumstances, the jury must impose a sentence of life without parole." (*Boyce, supra*, 59 Cal.4th at p. 724.)

"Defendant was not entitled to an instruction that there is a presumption in favor of life without parole." (*Boyce, supra*, 59 Cal.4th at p. 724.)

"The jury need not make written findings." (*Thomas, supra*, 53 Cal.4th at p. 836.)

Section 190.3's use of adjectives such as "extreme" and "substantial" in factors (d) and (g) does not "act as a barrier to the jury's consideration of mitigating evidence, in violation of constitutional commands." (*Powell*, *supra*, 5 Cal.5th at p. 964.)

"A trial court is not required to delete inapplicable mitigating factors, nor to identify whether factors are mitigating or aggravating." (*Potts*, *supra*, 6 Cal.5th at p. 1061.)

Neither is intercase proportionality review required. (*Thomas*, *supra*, 53 Cal.4th at p. 836.)

"The failure to afford capital defendants at the penalty phase the same procedural safeguards afforded to noncapital defendants does not offend equal protection principles, because the two groups are not similarly situated." (*Powell*, *supra*, 5 Cal.5th at p. 964.)

"California does not regularly use the death penalty as a form of punishment, and 'its imposition does not violate international norms of decency . . . .' " (*Brooks*, *supra*, 3 Cal.5th at p. 116.)

### 5. *Asserted cumulative effect of alleged errors*

Defendant urges us to set aside the death judgment because of the purported cumulative effect of alleged errors occurring at the guilt and penalty phase. We find no cumulative effect of any purported errors.

### 6. *Imposition of restitution fine*

#### a. *Background*

The judgment against defendant includes a $10,000 restitution fine imposed pursuant to section 1202.4. In levying the fine, the trial court considered the probation report. The report noted defendant's employment history, the fact that he

"denied owning any assets," and the factors in aggravation and mitigation. The report ultimately recommended that "[i]n keeping with the very serious nature of the offense, . . . defendant pay a restitution fine of $10,000."

The probation report also recommended that defendant be ordered to pay a $250 probation investigation fee. The report expressly noted that "defendant has the ability to pay [this fee]." Although trial counsel objected to the imposition of the probation investigation fee as well as a $20 court security fee, defendant does not challenge these fees before us.

Defendant does challenge the restitution fine. When the trial court announced its intention to impose that fine in accordance with the probation report's recommendation, defense counsel objected. "We would object to any fine," said counsel, "in view of Mr. Ramirez's inability to work or have any money from this point onward." The court responded, "I understand. Interestingly enough, the code expressly says that inability to pay is not a ground for not making the order, and — but I'm going to. I'm making the order."

### b. Analysis

At the time of defendant's trial, the Penal Code provision governing restitution — section 1202.4 — operated as follows. Section 1202.4, subdivision (b) specified that in every case in which a person is convicted of a felony, the court shall impose a restitution fine "unless it finds compelling and extraordinary reasons for not doing so." (§ 1202.4, former subd. (b)(1).) In addition, the amount of the fine "shall be set at the discretion of the court and commensurate with the seriousness of the offense," although the fine cannot be less than $200 or more than $10,000. (*Ibid.*) Former subdivision (c) then specified that "[a]

defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine" and "[i]nability to pay may be considered only in increasing the amount of the restitution fine in excess of the two hundred-dollar ($200) . . . minimum." Former subdivision (d) further focused on the amount of restitution and stated:

> "In setting the amount of the fine pursuant to subdivision (b) in excess of the two hundred-dollar ($200) . . . minimum, the court shall consider any relevant factors including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required."

In other words, in setting the amount of a restitution fine, the trial court must select an amount that reflects "the seriousness of the offense," and it must consider a host of factors — including a defendant's ability to pay — if it sets the fine above the minimum of $200. (§ 1204.4, former subd. (b)(1); see *id.*, former subd. (d).) The mere inability to pay, however, is not a reason to forgo a fine altogether. (§ 1204.4, former subd. (c).)

Defendant asserts that the trial court's restitution order violated both section 1204.4 and his federal and state constitutional rights. His premise is that the court did not consider his inability to pay in setting the restitution fine at $10,000.

We cannot say on this record that the trial court failed to follow established law by refusing to consider defendant's ability to pay before imposing a fine above the minimum amount. As discussed, section 1202.4 required judges to consider "the defendant's inability to pay" whenever they set a restitution fine "in excess of the minimum fine." (§ 1204.4, subd. (d).) Absent evidence to the contrary, we presume that the trial court knew the law and followed it. (See, e.g., *People v. Thomas* (2011) 52 Cal.4th 336, 361 ["In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law' "]; *Ross v. Superior Court of Sacramento County* (1977) 19 Cal.3d 899, 913–914.)

In this case, there is affirmative evidence indicating that the trial court knew that defendant's ability to pay was a factor in determining the fine to be imposed. First, the court considered and referred to the probation report. Because the report summarized defendant's financial position, stated he had the ability to pay a $250 probation investigation fee, and recommended that he pay a $10,000 restitution fee, it at least implicitly conveyed that defendant's ability to pay was a relevant consideration. Second, the court heard the defense argument, which was that defendant should not have to pay "any fine" "in view of [his] inability to work or have any money from this point onward." The court thereafter indicated that it "underst[ood]" the argument. None of this suggests that the

court did not take into consideration defendant's financial wherewithal in deciding to impose a $10,000 fine.

Defendant asks us to disregard all the above and instead focus on a single comment the court made. According to defendant, the trial court "plainly stated that it would not consider inability to pay" when it remarked, "[T]he code expressly says that inability to pay is not a ground for not making the order, and — but I'm going to. I'm making the order." As the Attorney General points out, however, the court's statement is a correct statement of law insofar as the court was noting that a defendant's inability to pay is not a legitimate basis to forgo imposition of *any* fine. (See § 1202.4, former subd. (c) ["A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the two hundred-dollar . . . minimum"]; *id.*, former subd. (d).) Because the court's comment immediately followed counsel's objection to the imposition of "any fine," we find the Attorney General's interpretation plausible. Alternatively, the court might have meant that although "the code expressly says that inability to pay is not a ground for not making the order," it was "going to" consider that ground because it was "making the order" that defendant pay more than the minimum. Either of these interpretations would defeat defendant's contention that the court openly declared it was not going to consider ability to pay. At the very least, defense counsel has not made a record sufficient for us to conclude that the trial judge, which referred to what "the code expressly says," failed to heed the code's plain requirement to consider ability to pay.

In sum, the court's comment — even if open-ended — does not persuade us that the presumption has been overcome that trial judges understand and follow established law. Beyond this comment, defendant has not identified "anything in the record indicating the trial court breached its duty to consider his ability to pay." (*People v. Gamache* (2010) 48 Cal.4th 347, 409.) "[A]s the trial court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor. Thus, we cannot say on this record that the trial court abused its discretion." (*Ibid.*; see also *People v. Miracle* (2018) 6 Cal.5th 318, 356 [same]; *People v. Nelson* (2011) 51 Cal.4th 198, 227 [same].)

Because the factual premise underlying defendant's argument fails, we reject the claims that the trial court violated either statutory or constitutional law in assertedly not considering defendant's ability to pay.[15]

### III. DISPOSITION

For the preceding reasons, we affirm the judgment in its entirety.

---

[15] We recently granted review in *People v. Kopp* (review granted Nov. 13, 2019, S257844) to decide certain issues relating to a defendant's ability to pay fines, fees, and assessments. Defendant may seek any relief to which he may be entitled after we decide *People v. Kopp*.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR , J.**
**KRUGER, J.**
**GROBAN, J.**
**HUFFMAN, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Ramirez

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S155160
**Date Filed:** January 28, 2021

_____

**Court:** Superior
**County:** Alameda
**Judge:** Jon R. Rolefson


_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, and Maria Morga, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Ronald S. Matthias, Assistant Attorney General, Glenn R. Pruden, Sarah J. Farhat and Elizabeth W. Hereford, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Maria Morga
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA 94607-4139
(510) 267-3300

Elizabeth W. Hereford
Deputy Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
(415) 510-3801