Filed 10/28/22  In re O.P. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re O.P., A Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. B.P., Defendant and Appellant. | G061357 (Super. Ct. No. 20DP0850) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Daphne Grace Sykes, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

\*          \*          \*

B.P. (Mother) appeals from an order terminating her parental rights over her now two-year-old daughter, O.P. (Minor), at a hearing pursuant to Welfare and Institutions Code section 366.26 (.26 hearing).[1]  She contends the Orange County juvenile court (the court) should have applied the parental-benefit exception to termination of parental rights under section 366.26, subd. (c)(1)(B)(i).  We disagree.  Mother failed to establish the parental-benefit exception applies to this case.  We accordingly affirm the order.

FACTS

*Detention*

In July 2020, Minor was taken into protective custody when she was only a few weeks old.  According to the Orange County Social Services Agency's (SSA) detention report, Mother was arrested for assault with a deadly weapon and child endangerment.  At the time, Mother and K.A. (Father) were not getting along so Father slept in his vehicle in the parking lot of their apartment building.  On the evening of Mother's arrest, Mother had confronted Father who was in his vehicle and an argument ensued.  Father drove away, and Mother pursued him in her vehicle.  Mother then crashed into Father's vehicle at least three times.  Father managed to escape and called law enforcement.  It was unknown if Minor was in Mother's vehicle at the time of the incident.

Mother thereafter returned to her residence and pushed a couch up against the door to prevent police officers from entering.  Once the police officers managed to open the door, Mother was uncooperative and denied everything.  The officers asked Mother to put Minor down, but she refused and "tightened her grip . . . ."  A struggle ensued, and the officers ultimately arrested Mother while securing Minor.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

2

Before transporting Minor to Orangewood Children and Family Center, a social worker noticed Minor's diaper needed to be changed. The social worker reported "the child's vagina was caked with feces and . . . there was so much and it was so packed, that [the social worker] stopped so not to hurt the baby." The social worker also noticed Minor had a severe diaper rash and her skin appeared to have raw irritated lesions. Because Minor seemed to be in pain, the social worker stopped cleaning the area so Minor could be treated by medical staff.

On the same day, a social worker interviewed Father who reported he was not comfortable caring for Minor and believed Minor should be taken into protective custody. Among other things, Father indicated Mother had been abusive towards him, threatened to kill herself, and was placed on a section 5150 psychiatric hold for suicidal ideation while eight months pregnant. He also revealed there were empty alcohol cans hidden throughout the apartment and noted Mother drank alcohol while pregnant.

According to Mother, Father had lied about the incident. She denied crashing into his vehicle and further denied any domestic violence, substance abuse, or mental health issues.

The social worker next interviewed the father of Minor's two half-siblings. The father confirmed he took care of the half-siblings and indicated he had a history of domestic violence with Mother who was the aggressor. He also was not surprised by Mother's arrest because he said she did not know how to control her temper.

Soon after, SSA filed a petition pursuant to section 300, subdivisions (b)(1) and (g). The petition detailed Mother's anger management problem, mental health issues, substance abuse, and history of domestic violence. After a detention hearing, the court detained Minor pending jurisdictional proceedings and authorized supervised visitation for Mother and Father. Minor was placed in the care of the maternal great-grandparents.

3

*Jurisdiction/Disposition*

Prior to the jurisdiction/disposition hearing, SSA recommended the court sustain the petition, declare Minor to be a dependent of the court, and provide reunification services to Mother. SSA's report indicated Minor had been placed in the care of her maternal great-grandparents. The report further noted Mother said she was willing to participate in all services offered and wanted to reunify with Minor as soon as possible.

At the jurisdictional hearing in October 2020, Mother waived her right to a trial and pleaded no contest to the petition as amended by interlineation. The court found the allegations in the amended petition true, bringing Minor within the provisions of section 300, subdivisions (b)(1) and (g). In November 2020, the court declared Minor a dependent, removed her from her parents' custody, and ordered reunification services. With respect to visitation, the court authorized Mother to spend the night at the caretakers' home while visiting Minor.

*First Reunification Period: November 2020 to May 2021*

Mother's case plan required her to participate in a domestic violence program, general counseling, a parent education program, drug testing, and a substance abuse program. The social worker described Mother's progress on her case plan during this period as minimal.

Regarding the domestic violence program and general counseling, Mother stopped contacting her therapist in January 2021. In March 2021, she told the social worker the counseling was not helpful and that she had completed all necessary services. She also indicated she was "annoyed" by the case because Minor was never in danger. According to the therapist, Mother "was very resistant to the therapeutic process" and "sporadic with setting and keeping scheduled appointment times and days."

4

As to the parent education program, Mother completed a program and provided a certificate of completion to the social worker. With respect to drug testing, Mother was generally compliant. She tested negative on seven different days from March 24, 2021 to April 14, 2021. Although she did not appear for required testing on two occasions, her absences were excused on those days. As of May 2021, Mother had not been referred to a substance abuse program.

Regarding visitation, Mother was authorized one supervised overnight visit per week at the caregivers' home. The great-grandmother initially reported Mother had visited Minor on two occasions—Thanksgiving in November 2020 and Christmas in December 2020. She later revealed Mother did not visit Minor on Christmas, but she dropped off presents for Minor with the great-grandfather. She also disclosed Mother had asked her to lie to the social worker about another visit that never happened. When the social worker asked why Mother would have lied about the visits, the great-grandmother speculated Mother wanted to visit but was busy with work. With respect to virtual visits, the great-grandmother reported Mother maintained virtual visits almost every day. She indicated Minor "'gets so happy" when Mother calls.

When confronted by the social worker, Mother insisted she had visited Minor and last visited in April 2021. Mother also reported it was difficult to maintain in-person visits because of her work schedule and because her great-grandparents lived about three hours away.

Meanwhile, Minor appeared to be happy, healthy, and stable with the great-grandparents who reported they were willing to adopt Minor. Given Mother's motivation to reunify, SSA recommended a second period of reunification services. The court adopted SSA's recommendations.

*Second Reunification Period: May 2021 to October 2021*

SSA's report for the 12-month review hearing recommended terminating Mother's reunification services and scheduling a .26 hearing. According to the report, Mother's progress on her case plan during this period was moderate.

Regarding the anger management program, Mother completed 14 sessions of individual therapy. The therapist noted Mother was "'resistant to the therapeutic process at first'" and sometimes "'distracted by doing other things.'" But the therapist noted Mother appeared "'to be a caring mom, going through a difficult time.'" In July 2021, the social worker advised Mother she needed to continue attending general counseling.

The social worker later contacted Mother's new therapist. According to the therapist, Mother said she already completed therapy and denied all of the allegations of her case. The therapist also described Mother as guarded. A few weeks later, the therapist reported Mother was opening up in therapy and taking responsibility for her actions. Mother also demonstrated insight, did not miss any sessions, and was committed to be the best mother possible. The therapist further noted Mother was afraid to put Minor in a daycare facility. Overall, the therapist provided positive feedback about Mother.

With respect to drug testing, Mother tested negative on 10 different occasions but failed to attend 11 tests. She provided various reasons for her absences. Given the missed tests, the requirement to complete a substance abuse treatment program was triggered.

Regarding visitation, both Mother and the great-grandmother confirmed Mother had daily virtual contact with Minor. By this time, Mother was authorized two consecutive overnight visits in the caregiver's home. Mother accordingly visited Minor on May 16, 2021 through May 18, 2021 at the great-grandparents' home. In June 2021,

Mother again visited Minor at the great-grandparents' home to celebrate Minor's birthday. She also visited Minor once in Orange County. As of July 2021, Mother was authorized to have Minor in her care for one week per month at her own home. In August 2021, Mother took care of Minor for one week in her own home. The social worker met with Mother and Minor during this time and reported Minor appeared happy and healthy. The social worker also noted Mother was attentive to Minor who "appeared comfortable in [Mother's] presence as evidenced by smiling and laughing while engaging in interactions with [Mother]." Mother did not have any other in-person visits with Minor after August 2021.

Despite Mother's general progress, SSA noted Mother's in-person visits were "sporadic." SSA also emphasized Mother was not able to take additional time away from work to assume primary custody of Minor and did not want to place Minor in daycare. Mother further declined childcare subsidies offered by SSA and indicated she wanted to work from home in the future at which time she wanted Minor returned to her care. The great-grandmother similarly reported Mother had planned for Minor to stay with the great-grandmother even before SSA's involvement. According to the great-grandmother, Mother wanted to take Minor after she had started her own business. Given Mother's inability to take custody of Minor and the caregivers' ability to provide permanency through adoption, SSA recommended terminating Mother's reunification services and scheduling a .26 hearing.

In October 2021, the court terminated Mother's reunification services and set a .26 hearing. The court noted Mother had agreed to a "soft .26," meaning that although the court terminated reunification services and set a .26 hearing, SSA was authorized to continue funding services for Mother. The hope was that Mother would participate in the services in an attempt to reunify with Minor. Under the "soft .26"

agreement, Mother was required to complete drug and alcohol testing, a drug and alcohol outpatient treatment program, an anger management program, and general counseling.

*Post-reunification Period: October 2021 to April 2022*

In February and April 2022, SSA filed two section 366.26 reports. According to those reports, Mother's drug testing services were terminated in November 2021 and she was restricted to supervised visits due to a missed drug test. Mother had completed general counseling and an anger management program, but she did not provide any evidence of completing a drug or alcohol outpatient program or drug and alcohol testing.

With respect to visits, Mother visited Minor from November 4, 2021 through November 12, 2021. She again visited Minor at the caregivers' home on November 25, 2021 and on December 25, 2021 through December 26, 2021. Mother then stopped visiting Minor for a few months. In March 2022, the great-grandmother and Minor had an overnight visit in Mother's home. According to the great-grandmother, Mother maintained virtual contact "'almost daily.'"

*.26 Hearing*

Mother failed to appear at the .26 hearing in April 2022, but her counsel argued the court should apply the "parent/child bond exception" to termination of parental rights. The court found Minor adoptable and terminated parental rights. The court did not address the "parent/child bond exception." Mother filed a timely notice of appeal.

DISCUSSION

Mother contends the court should have applied the parental-benefit exception to termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i).) She argues the court omitted any findings regarding the exception and further claims the court's silence made the weighing of the evidence "vulnerable to improper factors."

To the contrary, the court did not have to recite any specific findings regarding the parental-benefit exception. Mother also failed to meet her burden of establishing the exception.

*The Court Was Not Required to Expressly Address the Parental-benefit Exception*

At the outset, Mother suggests the court committed reversible error because it did not make any express findings as to the parental-benefit exception. We disagree.

Once reunification services have ended, the juvenile court is required to terminate parental rights unless an exception to adoption applies. (§ 366.26, subd. (c)(1).) One of those exceptions is the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) Under the statutory exception, the court must terminate parental rights unless it "finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*)

Here, the court did not expressly mention the parental-benefit exception, but it was not required to do so. As the court stated in *In re A.L.* (2022) 73 Cal.App.5th 1131, "we infer from section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination *would not*

9

*be* detrimental." (*Id.* at p. 1156.) "[W]e are aware of no requirement . . . that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings . . . ." (*Ibid.*)

We also note our Supreme Court articulated specific guidance regarding the parental-benefit exception in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). *Caden C.* was decided in May 2021, almost a year before the juvenile court's .26 ruling. "Absent evidence to the contrary, we presume . . . the trial court knew the law and followed it." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.)

*The Record Supports the Court's Implied Finding That the Parental-benefit Exception Did Not Apply*

In *Caden C.*, our Supreme Court identified three elements a parent must prove to establish the parental-benefit exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The first two elements are reviewed for substantial evidence. (*Id.* at pp. 639-640.) The third element is reviewed for abuse of discretion. (*Id.* at p. 640.) To the extent Mother challenges the court's findings regarding her failure of proof, we determine whether the evidence compels a finding in her favor as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

We address each of the three elements in turn below.

A. Regular Visitation and Contact

As the *Caden C.* court observed, the "regular visitation and contact" element is "straightforward." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by

10

court orders.'" (*Ibid.*) Courts accordingly should consider whether parents "'maintained regular visitation and contact with the child.'" (*Ibid.*)

Here, the SSA reports suggest Mother's visits were not consistent. During the first reunification period, Mother was authorized one supervised overnight visit per week at the caregivers' home. It appears Mother visited Minor only once in November 2020, but she never visited Minor overnight. Mother also asked the great-grandmother to lie to the social worker about another visit that never happened.

During the second reunification period, Mother was authorized two consecutive overnight visits at the caregivers' home. She later was authorized to have Minor in her care for one week per month at her own home. Although Mother visited Minor at increased intervals from May 2021 to August 2021, she stopped visiting Minor in August 2021. Despite Mother's improvement during the second reunification period, SSA described Mother's in-person visits as "sporadic."

In the months before the .26 hearing, Mother initially visited Minor but again stopped visiting for a few months. She then had an overnight visit with Minor in March 2022 before the .26 hearing in April 2022.

Given these facts, the evidence does not compel a finding for Mother on the "regular visitation and contact" element. To the contrary, the evidence suggests Mother participated in visits interspersed with various absences. Mother claims she was not able to visit for various reasons, "including global pandemic safety precautions, Mother's illness, the long distance between her home and the caretakers' home, and Mother's work schedule." She argues those absences were offset by the daily virtual visits she maintained throughout the entire reunification period. But in reviewing factual determinations for substantial evidence, we cannot "'reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Caden C.*, *supra*, 11 Cal.5th

11

at p. 640.) "The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists . . . .'" (*Ibid.*)

### B. Beneficial Relationship

As to the benefit element, the *Caden C.* court noted "courts assess whether 'the child would benefit from continuing the relationship.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Ibid.*) Courts "consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

In this case, Minor had been out of Mother's care for most of her life. She was taken into protective custody when she was only a few weeks old. At the time of the .26 hearing, Minor was almost 2 years old. SSA's section 366.26 report also noted Mother had not maintained a bond with Minor. While Mother cared for Minor during visits and they had some positive interactions, there was no evidence the interactions were anything more than friendly. There also was no evidence Minor suffered negative effects when separated from Mother. A beneficial relationship requires "more than the incidental benefit a child gains from any amount of positive contact with" the parent. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 318.) "[P]leasant and cordial . . . visits are, by themselves, insufficient to mandate a permanent plan other than adoption." (*In re Brian R.* (1991) 2 Cal.App.4th 904, 924.) Instead, Mother was required to demonstrate a "'substantial, positive emotional attachment.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

12

Mother complains there is an absence of information in the SSA reports regarding Minor's interactions with Mother. But it was Mother's burden to show the parental-benefit exception applied, and she failed to attend the .26 hearing or present any evidence. Overall, there is substantial evidence supporting an implied finding that Mother did not demonstrate a beneficial relationship.

C. Detriment Resulting from Termination of Relationship

With respect to the third element, a court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Ibid.*)

Because Mother failed to carry her burden to establish a substantial, positive emotional attachment, it appears there would be minimal harm from severing Minor's relationship with Mother. (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1158 [considering the strength and quality of the parent's relationship with the child].) Mother's grandparents cared for Minor for most of her life, and Minor was happy, healthy, and stable with them. Even before SSA's involvement, Mother conceded she wanted her grandmother to raise Minor until Mother could establish her own business and work from home. Considering the record as a whole, the evidence supports a finding that Minor would be best served by adoption. We cannot find the court abused its discretion.

13

DISPOSITION

The order is affirmed.

SANCHEZ, J.

WE CONCUR:

MOORE, ACTING P. J.

MARKS, J.*

*Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.